217 P.3d 321 (2009)
STATE of Washington, Respondent,
v.
Charles MOMAH, Petitioner.
No. 81096-6.
Supreme Court of Washington, En Banc.
Argued June 10, 2008.
Decided October 8, 2009.
*323 James Morrissey Whisman, King County Prosecutor's Office, Seattle, WA, for Respondent.
Sheryl Gordon McCloud, Law Offices of Sheryl Gordon McCloud, Jeffrey L. Fisher, Davis Wright Tremaine LLP, Seattle, WA, for Petitioner.
C. JOHNSON, J.
¶ 1 The Washington Constitution provides in relevant part that an accused has the right to "a speedy public trial by an impartial jury." Const. art. I, § 22 (emphasis added). This case asks us to determine whether a defendant's constitutional right to a public trial under article I, section 22 was violated *324 when the trial court closed a portion of voir dire to safeguard the defendant's right to a trial by an impartial jury. While our previous article I, section 22 cases have focused on the defendant's right to a public trial, this case implicates both the right to a public trial and the right to an impartial jury. Here, we find the trial court, in consultation with the defense and the prosecution, carefully considered the defendant's article I, section 22 rights, closed the courtroom to preserve his right to an impartial jury, and narrowly tailored the closure to secure that right. We hold the closure in this case was not a structural error and affirm Charles Momah's conviction.

FACTS
¶ 2 In 2005, Charles Momah, a gynecologist, was charged in King County Superior Court with one count of rape in the third degree, two counts of indecent liberties, and one count of rape in the second degree. These charges arose out of allegations that Momah had sexually violated his patients as he performed physical examinations. The case was scheduled for a jury trial.
¶ 3 Momah's case was heavily publicized, having received extensive media coverage. Due to the significant amount of publicity, a large number of prospective jurors, over 100, were summoned. Tr. of Proceedings on Appeal (TPA) (Oct. 10, 2005) at 3. Based on the jurors' responses to portions of the juror questionnaire, the judge, prosecutor, and defense counsel discussed a list of jurors to be individually questioned. TPA (Oct. 11, 2005) at 5-8, 17-20. Momah's counsel agreed to the private questioning of potential jurors and also argued for the expansion of in-chambers questioning. Defense counsel proposed:
Your Honor, it is our position and our hope that the Court will take everybody individually, besides those ones we have identified that have prior knowledge. Our concern is this: They may have prior knowledge to the extent that that might disqualify themselves, or we have the real concern that they will contaminate the rest of the jury.
TPA (Oct. 11, 2005) at 4. The prosecutor agreed to the proposal to expand the individual questioning. TPA (Oct. 11, 2005) at 4.
¶ 4 A list of jurors to be individually questioned was then selected, and defense counsel agreed with this list. TPA (Oct. 11, 2005) at 5-6. The group of jurors questioned in-chambers included three general categories: (1) people who indicated prior knowledge about the case, (2) people who asked for private questioning, or (3) people who said they could not be fair. TPA (Oct. 11, 2005) at 27.
¶ 5 Before moving into chambers for private questioning, the judge acted to prevent jurors with knowledge of the case from potentially tainting the rest of venire by explaining the importance of an impartial jury to a fair trial. The trial judge stated:
It is important for the fairness of the process to both sides that no juror and no individual research any aspect of this case.... The case has to be decided on the evidence presented in court.... Secondly, it is important that you not talk amongst yourselves about the case.... [Y]ou just cannot talk about the case, your views, impressions, because at this point you have not heard any evidence. And you may in the end not even be seated on the jury.
TPA (Oct. 11, 2005) at 16-17. After the court moved into chambers, Momah's counsel actively participated in individual juror questioning regarding prior knowledge of Momah's case and the ability to be fair and impartial. TPA (Oct. 11, 2005) at 19-142. The defense counsel and the prosecution individually questioned about 20 jurors during the morning and then 4 more later that afternoon.[1] TPA (Oct. 11, 2005) at 19-104, 107-42. As a result of the in-chambers voir dire, defense counsel exercised numerous challenges for cause. TPA (Oct. 11, 2005) at 38-48, 59-78, 89-104.
¶ 6 At the conclusion of trial, the jury convicted Momah of all charges. The trial court imposed a standard range sentence of *325 245 months. The Court of Appeals, Division One affirmed his convictions.

ISSUE
¶ 7 Whether the trial court violated Momah's constitutional right to a public trial?

ANALYSIS
¶ 8 To determine whether the trial court violated Momah's rights, we first review separately the article I, section 22 rights this case implicates: the right to a speedy public trial and the right to an impartial jury.

A. Public Trial Right
¶ 9 Whether the right to a public trial has been violated is a question of law subject to de novo review. State v. Bone-Club, 128 Wash.2d 254, 256, 906 P.2d 325 (1995).
¶ 10 Article I, section 10 provides that "[j]ustice in all cases shall be administered openly." The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to a "public trial by an impartial jury." These provisions have a commonality: they protect the right to a public proceeding.
¶ 11 Our cases have recognized the importance of open proceedings and have emphasized that article I, section 10 secures the public's free and open access to judicial proceedings. We have also stressed that openness of courts is essential to the court's ability to maintain public confidence in the fairness and honesty of the judicial branch of government. But these principles do not exist in isolation of other constitutional rights and principles.
¶ 12 Article I, sections 10 and 22 serve complementary and interdependent functions in assuring fairness of our judicial system, particularly in the context of a criminal proceeding. Indeed, the central aim of any criminal proceeding must be to try the accused fairly. Thus, the requirement of a public trial is primarily for the benefit of the accused: that the public may see he is fairly dealt with and not unjustly condemned and that the presence of interested spectators may keep his triers keenly alive to a sense of the responsibility and to the importance of their functions. For these reasons, under article I, sections 10 and 22, a strong presumption exists that courts are to be open at all trial stages.
¶ 13 This presumption of openness extends to voir dire because "`[t]he process of juror selection ... is itself a matter of importance, not simply to the adversaries but to the criminal justice system.'" In re Pers. Restraint of Orange, 152 Wash.2d 795, 804, 100 P.3d 291 (2004) (quoting Press-Enter. Co. v. Superior Court, 464 U.S. 501, 505, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)). While the right to a public trial applies to all judicial proceedings, including jury selection, the right is not absolute. The presumption in favor of openness may be overcome by an overriding interest based on findings that closure is essential to preserve higher values and narrowly tailored to serve that interest. Thus, the court may close a courtroom under certain circumstances.
¶ 14 To protect the defendant's public trial right under article I, section 22, this court adopted the same standard for closing the court that applies to cases under article I, section 10. Bone-Club, 128 Wash.2d at 259, 906 P.2d 325. The decisions employing this closure standard for both sections 10 and 22 cases are similar to the analysis applied under the Sixth Amendment and the United States Supreme Court decision in Waller v. Georgia, 467 U.S. 39, 47, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). To determine if closure is appropriate, we apply closure guidelines drawn from Waller's approach. Bone-Club, 128 Wash.2d at 259-61, 906 P.2d 325; Orange, 152 Wash.2d at 805-08, 100 P.3d 291. These five guidelines are as follows:
"1. The proponent of closure ... must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

*326 "3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
"4. The court must weigh the competing interests of the proponent of closure and the public.
"5. The order must be no broader in its application or duration than necessary to serve its purpose."
Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325 (emphasis added) (alteration in original) (quoting Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993)). After applying these guidelines, the court should enter specific findings on the record to justify the closure.
¶ 15 If, on appeal, the court determines that the defendant's right to a fair public trial has been violated, it devises a remedy appropriate to that violation. If the error is structural in nature, it warrants automatic reversal of conviction and remand for a new trial. An error is structural when it "`necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" Washington v. Recuenco, 548 U.S. 212, 218-19, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (alterations in original) (quoting Neder v. United States, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Waller itself establishes that not all courtroom closure errors are fundamentally unfair and thus not all are structural errors; our cases applying Waller also support that proposition.
¶ 16 In Waller, the trial court closed the courtroom for a suppression hearing over the objections of the defendant, and, on review, the Supreme Court held that the defendant was entitled to a new suppression hearing, but not automatically a new trial. The Court reasoned that "the remedy should be appropriate to the violation," and if it were to automatically grant a new trial without requiring a new hearing, the result would be a "windfall for the defendant" and would thus "not be in the public interest." Waller, 467 U.S. at 50, 104 S.Ct. 2210. The Court did not conclusively presume prejudice and grant automatic reversal of the defendant's conviction and a new trial. Rather, in Waller, the Court required a showing that the defendant's case was actually rendered unfair by the closure.
¶ 17 Similarly, in our cases following Waller, we have held that the remedy must be appropriate to the violation and have found a new trial required in cases where a closure rendered a trial fundamentally unfair. For instance, in State v. Easterling, 157 Wash.2d 167, 137 P.3d 825 (2006), we remanded a case for a new trial where the court closed the courtroom, excluding the defendant from a portion of his own trial, while his codefendant made a motion to sever and struck a deal with the State to testify against him. In that case, the closure affected the fairness of Easterling's trial because the court did not seek or receive input or objection from Easterling, and it prevented him from being present during a portion of his own proceedings.
¶ 18 Likewise, in Orange, we ordered a new trial because the trial court excluded the defendant's family and friends from voir dire, though defense counsel twice requested that they be present. The closure compromised Orange's right to a fair trial by excluding his family and friends from "`contribut[ing] their knowledge or insight to the jury selection and the inability of venirepersons to see the interested individuals.'" Orange, 152 Wash.2d at 812, 100 P.3d 291 (emphasis omitted) (quoting Watters v. State, 328 Md. 38, 48, 612 A.2d 1288 (1992)); see also Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (without seeking objection or receiving assent from defendant, court excluded defendant from closed pretrial suppression hearing to protect undercover activities of State's witness); State v. Brightman, 155 Wash.2d 506, 122 P.3d 150 (2005) (court ordered sua sponte closure, without seeking objection or receiving assent from defendant and excluded defendant's family and friends from courtroom due to concerns over space and security).
¶ 19 In the aforementioned cases, the closure errors were held to be structural in nature. Prejudice to the defendant in those cases was sufficiently clear and required the remedy of a new trial. In each case, the trial court closed the courtroom based on interests other than the defendant's; the closures impacted the fairness of the defendant's proceedings; *327 the court closed the courtroom without seeking objection, input, or assent from the defendant; and in the majority of cases, the record lacked any hint that the trial court considered the defendant's right to a public trial when it closed the courtroom. Bone-Club, 128 Wash.2d at 260, 906 P.2d 325 (court held closure a structural error, reasoning in part that "the record lacks any hint the trial court considered Defendant's public trial right"); Brightman, 155 Wash.2d at 518, 122 P.3d 150 (same); Orange, 152 Wash.2d at 811-12, 100 P.3d 291 (same). Accordingly, we reversed the convictions and remanded the cases for a new trial.
¶ 20 Applying these principles to this case, we find the facts distinguishable from our previous closure cases. Here, Momah affirmatively assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in it, and benefited from it. Moreover, the trial judge in this case not only sought input from the defendant, but he closed the courtroom after consultation with the defense and the prosecution. Finally, and perhaps most importantly, the trial judge closed the courtroom to safeguard Momah's constitutional right to a fair trial by an impartial jury, not to protect any other interests. Where, as here, a defendant's other constitutional rights are implicated, the trial court is required to give due consideration to those rights in determining whether closure is appropriate.[2]

B. Impartial Jury
¶ 21 Under article I, section 22, the accused is entitled to a "public trial by an impartial jury" (emphasis added). The right to a public trial and the right to an impartial jury are two interrelated but distinct rights. As described above, article I, section 22's "public trial" right, like article I, section 10's right of the public to open proceedings, focuses on the public nature of a defendant's fair trial right. The "impartial jury" aspect of article I, section 22, focuses on the defendant's right to have unbiased jurors, whose prior knowledge of the case or their prejudice does not taint the entire venire and render the defendant's trial unfair. Indeed, an essential element of a fair trial is an impartial trier of facta jury capable of deciding the case based on the evidence before it. Thus, voir dire is a significant aspect of trial because it allows parties to secure their article I, section 22 right to a fair and impartial jury through juror questioning.
¶ 22 On the one hand, Momah had a right to have openness where the public and jurors could hear every part of the proceedings, ensuring the fairness of his trial process. On the other, Momah had a right to an impartial jury, wherein no juror's prejudice or prior knowledge would compromise the fairness of Momah's trial process. One right privileges openness, while the other may necessitate closure.
¶ 23 As we have stated in instances where article I, sections 10 and 22 were in conflict: we must harmonize the right to a public trial with the right to an impartial jury. Federated Publications, Inc. v. Kurtz, 94 Wash.2d 51, 61, 615 P.2d 440 (1980). In Kurtz, a newspaper sought both to gain access to a pretrial suppression hearing and an injunction barring the trial judge from excluding it from other aspects of a trial in a highly publicized murder case. In that case, this court held the trial judge struck the proper balance between the defendant's right to an impartial jury and the public's right of access by closing the courtroom, and we denied the requested relief. We reasoned in part that given the difficulty of effacing pretrial publicity from jurors' minds, trial courts must take appropriate measures to ensure that the balance is never weighted against the accused.
¶ 24 In the present case, we must also balance the article I, section 22 rights at issue. To achieve the proper balance, we construe those rights in light of the central aim of a criminal proceeding: to try the accused fairly. Further, to ensure that a criminal defendant receives a fundamentally fair trial, we permit the accused to make tactical choices to advance his own interests *328 and ensure what he perceives as the fairest result. In our adversarial system, these are basic rights of the accused. Accordingly, the choices a party makes at trial may impact their ability to seek relief from an alleged error or may affect the remedy they receive.
¶ 25 In some cases, courts have used the invited error doctrine to analyze the impact a party's tactical choices have on alleged error. The basic premise of the invited error doctrine is that a party who sets up an error at trial cannot claim that very action as error on appeal and receive a new trial. The doctrine was designed in part to prevent parties from misleading trial courts and receiving a windfall by doing so. State v. Henderson, 114 Wash.2d 867, 868, 792 P.2d 514 (1990). Different factors have led courts to conclude that the alleged error merits denial of relief under this doctrine.
¶ 26 In City of Seattle v. Patu, 147 Wash.2d 717, 58 P.3d 273 (2002), we found the invited error doctrine applicable where a defendant proposed a jury instruction based on an ordinance that was later declared unconstitutional. In Patu, the defendant proposed an instruction that was missing an essential element of the crime, the court accepted the instruction, and the jury convicted the defendant. On appeal, the defendant sought reversal of conviction based on the trial court's failure to include an essential element of the offense in the instruction. We affirmed the conviction and held the invited error doctrine applied, reasoning that a party may not request an instruction and later complain on appeal that the requested instruction was given. See also State v. Studd, 137 Wash.2d 533, 973 P.2d 1049 (1999) (holding invited error doctrine applicable to defendants who proposed erroneous instruction without attempting to add remedial instruction and reasoning, although error was of constitutional magnitude and presumed prejudicial, defendants invited error and could not complain on appeal). In determining whether the invited error doctrine was applicable, courts have also considered whether a defendant affirmatively assented to the error, materially contributed to it, or benefited from it. See, e.g., State v. LeFaber, 128 Wash.2d 896, 904, 913 P.2d 369 (1996) (Alexander, J., dissenting) (considering distinction between defendant's failure to object to error and affirmatively assent to error); In re Dependency of K.R., 128 Wash.2d 129, 147, 904 P.2d 1132 (1995) (considering whether defendant materially contributed to error); People v. Thompson, 50 Cal.3d 134, 157, 266 Cal.Rptr. 309, 785 P.2d 857 (1990) (considering whether defendant benefited from closure).
¶ 27 While Momah does not present a classic case of invited error, the doctrine and the factors courts have used in cases applying it are helpful for the purposes of determining the appropriate remedy in this case. In harmonizing the defendant's rights under article I, section 22, we consider Momah's tactical choices and apply the basic premise of the invited error doctrine to determine what, if any, relief should be granted.
¶ 28 Momah asserts that his failure to object does not constitute a waiver of his public trial right such that he is prohibited from raising this issue for the first time on appeal and seeking a new trial. While Momah is correct in terms of the ability to raise the issue, in none of the cases cited as support do the defendants affirmatively advocate for closure, argue for the expansion of the closure, and benefit from it. See, e.g., Easterling, 157 Wash.2d 167, 137 P.3d 825 (defendant denied opportunity to object and was not permitted to participate in closed hearing on codefendant's motion to sever); Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (defendant denied opportunity to object and was not permitted to participate in the closed pretrial suppression hearing). Momah's situation is distinguishable from that of other defendants in closure cases. Additionally, being able to raise an issue on appeal does not automatically mean reversal is required.
¶ 29 From the outset of trial, we presume Momah made tactical choices to achieve what he perceived as the fairest result. Before in-chambers voir dire began, defense counsel, the prosecution, and the judge discussed numerous proposals concerning the juror selection. TPA (Oct. 6, 2005) at 67-91; TPA (Oct. 10, 2005) at 4-7; TPA (Oct. 11, 2005) at 1-18. Although Momah was provided the opportunity to object to the in-chambers proposal, he *329 never objected. Further, he gave no indication that a closed voir dire might violate his right to public trial. To the contrary, defense counsel made a deliberate choice to pursue in-chambers voir dire to avoid "contamination" of the jury pool by jurors with prior knowledge of Momah's case. Defense counsel affirmatively assented to, participated in, and even argued for the expansion of in-chambers questioning. As a result of this closure and defense counsel's active participation in the questioning, Momah was able to exercise numerous challenges for cause, removing biased and partial jurors from the venire. We find all of these actions by Momah's counsel and the trial judge occurred in order to promote and safeguard the right to an impartial jury.
¶ 30 As we stated above, courts grant automatic reversal and remand for a new trial only when errors are structural in nature. An error is structural when it necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. In each case, the remedy must be appropriate to the violation.
¶ 31 We hold the closure in this case was not a structural error. The closure occurred to protect Momah's rights and did not actually prejudice him. The record reveals that due to the publicity of Momah's case, the defense and the trial court had legitimate concerns about biased jurors or those with prior knowledge of Momah's case. The record also demonstrates that the trial court recognized the competing article I, section 22 interests in this case. The court, in consultation with the defense and the prosecution, carefully considered the defendant's rights and closed a portion of voir dire to safeguard the accused's right to an impartial jury. Further, the closure was narrowly tailored to accommodate only those jurors who had indicated that they may have a problem being fair or impartial. Momah affirmatively accepted the closure, argued for the expansion of it, actively participated in it, and sought benefit from it. Thus, the underlying facts and impact of the closure in Momah are significantly different from those presented by our previous cases. Reversal of Momah's conviction and remand of his case cannot be the remedy under these circumstances. We affirm the jury's determination of guilt.
WE CONCUR: MADSEN, OWENS, FAIRHURST, J. JOHNSON, JJ., and PENOYAR, J.P.T.
PENOYAR, J.[*] (concurrence).
¶ 32 I concur in the majority authored by Justice Charles Johnson. In addition, I concur because it is not argued that any person wishing to attend the proceedings was excluded. In sporting parlance, "No harm, no foul."
ALEXANDER, C.J. (dissenting).
¶ 33 I dissent because, in my view, the majority wrongly concludes that Charles Momah "affirmatively assented to the closure, argued for its expansion, had the opportunity to object but did not, actively participated in it, and benefited from it." Majority at 327. Except for Momah's tacit participation in the closed-door questioning, there is no support in the record for any of these conclusions. Indeed, the record discloses that Momah did not affirmatively assent to closure, did not argue for the expansion of it, was not asked if he objected to it, and did not benefit from it. The record demonstrates, rather, that the trial court closed jury voir dire on its own initiative and failed to consider any of the constitutional rights we discussed in State v. Bone-Club, 128 Wash.2d 254, 906 P.2d 325 (1995). Neither did the trial court engage in the closure analysis made mandatory by that decision. The trial court's closure of the courtroom to the public without first performing the Bone-Club test is a structural error that cannot be deemed harmless. I would, therefore, reverse Momah's conviction and remand for a new trial.

I
¶ 34 The Washington Constitution, like the Sixth Amendment to the United States Constitution, *330 guarantees that in criminal proceedings, the accused has the right to a "public trial by an impartial jury." CONST. art. I, § 22; U.S. Const. amend. VI. But unlike the United States Constitution, the Washington Constitution contains additional provisions that ensure the right to open court proceedings. One of these provisions is article I, section 10, which recognizes the public's right to have "[j]ustice in all cases ... administered openly." The other is article I, section 35, which provides that victims of crimes "have the right to ... attend trial and all other court proceedings the defendant has the right to attend." The latter provision is a "basic and fundamental right[ ]," which "ensure[s] victims a meaningful role in the criminal justice system and ... accord[s] them due dignity and respect." Const. art. I, § 35.[1]
¶ 35 The aforementioned sections of the Washington Constitution "serve complementary and interdependent functions in assuring the fairness of our judicial system." Bone-Club, 128 Wash.2d at 259, 906 P.2d 325. Because these provisions safeguard the right to public trials, courtrooms should be closed only in "rare circumstances." Id. at 258, 906 P.2d 325. In order to protect the various interests implicated by the aforementioned constitutional provisions, our court has developed a strict, well-defined standard for closing a courtroom, which complies with both federal and state constitutional requirements. It is the Bone-Club "test."[2]

II
¶ 36 The Bone-Club test is a standard by which trial court judges can determine whether or not a courtroom should be closed to the public. Under this standard, the trial court should enter specific findings to support closure of the courtroom or, at the very least, set forth on the record what facts caused it to conclude that closure was justified. Findings spread on the record are particularly critical in a case where no one objects to closure, since in such circumstances the judge has an overriding responsibility to safeguard the constitutional right to a public trial. As I noted above, the record reveals that here, the trial judge closed the courtroom on his own initiative and he did so without any discussion of the Bone-Club criteria. Furthermore, the trial judge did not justify the closure by entering written findings of fact or setting forth oral findings on the record. In the absence of a closure hearing and explicit findings justifying the closure, the constitutionally required standard for closing a courtroom is not met. See In re Pers. Restraint of Orange, 152 Wash.2d 795, 810-11, 100 P.3d 291 (2004) (failure to follow the Bone-Club closure test resulted in a record that demonstrated the trial judge did not identify a compelling interest, fully considered alternatives, or weighed competing interests).

A
¶ 37 In affirming the trial court, the majority focuses on what it determines was the trial judge's justification for closing the courtroom. The claimed justification was the trial court's concern that prospective jurors could become biased through exposure to the questioning of members of the jury venire who had prior knowledge of the case. While this concern is understandable, it does not justify closure of the courtroom during the jury voir dire. As I point out hereafter, *331 there were less restrictive means of preventing juror contamination than a complete closure of the courtroom.
¶ 38 Contrary to the majority's reading of the record, Momah's counsel did not ask the trial judge to close the courtroom during jury voir dire. Neither did he agree to the closure. Momah's counsel simply suggested that jurors be questioned individually in a courtroom. During the ensuing discussion about how to handle the individual questioning, the State broached the idea of questioning jurors in a private setting. Ultimately the trial judge determined that the questioning of individual jurors would take place in chambers. Responding to a juror who said he did not want to be individually questioned, the trial judge informed the venire that he had "decided it would be in everybody's interest if you would be questioned individually." Report of Proceedings (Oct. 11, 2005) at 19.
¶ 39 During this closed phase of voir dire, jurors were shuttled between the main jury room and two different courtrooms. One of the courtrooms held a subset of the venire that included jurors who had prior knowledge of the case and whose questionnaires indicated that service on the jury would be a hardship. Once the hardship issues were dealt with, the trial judge arranged to have the other jurors brought into chambers one at a time for individual questioning. After a break for lunch, the jury selection process reconvened in another courtroom. During this phase, some members of the jury venire remained in the courtroom while others were taken into a jury room for individual questioning.[3] Before prospective jurors were questioned individually in the jury room, the trial judge said the following:
I guess we have twenty folks outside in the hall. What I propose to do is have them come into the courtroom, we will move to the jury room for the individual questioning, and question them one at a time. I thought about having them in the jury room, but there is (sic) only 16 chairs.
Id. at 105.
¶ 40 On the third day of jury selection, some prospective jurors were again questioned individually. Unlike the earlier process, however, the trial judge directed that individual questioning occur in the courtroom. On this occasion, those persons designated for individual questioning were held as a group in a jury room and summoned one at a time into the courtroom for questioning.
¶ 41 There is, in my view, a substantial distinction between, on the one hand, questioning prospective jurors individually and, on the other, questioning them privately in chambers or in a jury room with the door closed. As noted above, the questioning of prospective jurors individually in order to avoid juror contamination is appropriate in certain cases and the trial judge may well have had legitimate reasons for concluding that certain members of the jury venire be questioned individually. But this could have been done in open court. Questioning prospective jurors in the privacy of chambers or a jury room with the doors of these rooms closed to the public is a de facto courtroom closure. The question then becomes was the courtroom closure justified?

B
¶ 42 Our cases require a trial court to "resist a closure motion except under the most unusual circumstances." Bone-Club, 128 Wash.2d at 259, 906 P.2d 325. As noted above, the record demonstrates that neither party advocated for closure of voir dire. Instead, the trial judge closed the courtroom without prompting to individually question prospective jurors in the privacy of chambers and later in a closed jury room. We have previously applied the Bone-Club criteria to this type of closure. See Orange, 152 Wash.2d at 808, 100 P.3d 291 (temporary closure of voir dire is a closure that must meet the Bone-Club standard).
¶ 43 Under Bone-Club, the proponent of closure must identify a compelling interest for closure, and if that interest is something other than the accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that interest. When neither party proposes closure, it is the trial *332 judge's responsibility to identify the compelling interest or interests that support closure. The record clearly demonstrates that the closure was primarily motivated by the trial judge's preference for questioning certain members of the jury voir dire in private. Unfortunately, the record lacks any hint that the trial judge considered any other interests prior to conducting a portion of juror voir dire in a nonpublic setting. Without explicit findings in the record, there is no way for this court to determine whether the trial judge considered whether keeping voir dire open to the public presented a "serious and imminent threat" to the selection of a fair and impartial jury.
¶ 44 The Bone-Club criteria directs a trial judge to consider the least restrictive means available to protect threatened interests. This means that the judge must consider alternatives to closing the courtroom. Bone-Club, 128 Wash.2d at 260, 906 P.2d 325. Here, there was an obvious alternative to closure, that being the individual questioning of jurors in the courtroom. This could easily have been accomplished because, as the record shows, there were at least three rooms available among which jurors were shuttledtwo courtrooms and the main jury room. Additionally, there was a jury room adjacent to one of the courtrooms that could have been used to hold jurors until they were ready to be brought into the courtroom for individual questioning. The ease with which jurors could have been summoned for questioning in open court rather than in a room closed to the public is demonstrated by the fact that the trial judge used this method for the questioning of jurors on the third day of voir dire. Thus, it is clear that a less restrictive alternative to closure was readily available. See Orange, 152 Wash.2d at 810, 100 P.3d 291 (describing alternatives to closure that the trial court failed to consider).

C
¶ 45 The Bone-Club test also requires the trial judge to weigh the interests in favor of closure against competing interests. Regrettably, the trial judge closed the courtroom without providing any analysis and discussion on the record concerning the rights of the defendant, the public, or victims to have the trial conducted publicly. Absent the required analysis, this court cannot determine whether the constitutional rights held by those parties were considered or ignored.[4]
¶ 46 The majority incorrectly assumes that closure of the courtroom during a portion of jury selection was essential to protect Momah's right to an impartial jury. To the contrary, it is the individual questioning of prospective jurors that protected that right, not the closure of voir dire to the public. Thus, it is misleading to frame the issue as a weighing test between the right to a public trial and the right to an impartial jury. Rather, the competing interests were the right to a public trial and the trial judge's preferred method for conducting voir dire.
¶ 47 The procedure employed by the trial judge did not conform to our precedent which, as noted above, requires the trial court to eschew closing a courtroom without first applying and weighing the five criteria set forth in Bone-Club. State v. Easterling, 157 Wash.2d 167, 175, 137 P.3d 825 (2006). The error here, in sum, was not necessarily closure of the courtroom, but the trial court's failure to perform the Bone-Club closure test prior to doing so.

III
¶ 48 The lack of specific findings in the record justifying closure is presumptively prejudicial to the constitutional right to have trials conducted publicly. Orange, 152 Wash.2d at 814, 100 P.3d 291; Bone-Club, *333 128 Wash.2d at 261-62, 906 P.2d 325. This court has previously held that when the trial court fails to consider and make specific findings concerning the public trial right, we cannot determine whether the closure was warranted. State v. Brightman, 155 Wash.2d 506, 518, 122 P.3d 150 (2005). In such situations, the transparency and fairness of criminal trials must be protected. Easterling, 157 Wash.2d at 178, 137 P.3d 825. The presumptive remedy for an unjustified closure of a criminal trial is remand for a new trial.[5]Easterling, 157 Wash.2d at 174, 137 P.3d 825; Bone-Club, 128 Wash.2d at 256, 906 P.2d 325.
¶ 49 The majority holds that a new trial is inappropriate for a defendant who seeks advantage by failing to object to a courtroom closure. This determination is premised on the faulty belief that closure somehow benefited Momah. As explained above, Momah's interest in an impartial jury could easily have been protected without closing the courtroom. Thus, the lack of an objection by Momah cannot be said to be a "tactical choice" suggested by the majority. Furthermore, the fact that Momah never requested closure of the courtroom and merely asked through his counsel that individual questioning of jurors take place in a courtroom belies the conclusion that trial tactics were in play.
¶ 50 It must be noted, also, "that a defendant does not waive his right to appeal an improper closure by failing to lodge a contemporaneous objection." Easterling, 157 Wash.2d at 176 n. 8, 137 P.3d 825 (citing Brightman, 155 Wash.2d at 514-15, 122 P.3d 150). Significantly, the notion that waiver of a constitutional right can be implied by the actions of a defendant has been rejected by this court. See City of Bellevue v. Acrey, 103 Wash.2d 203, 207, 691 P.2d 957 (1984) (holding that the right to a jury trial can only be waived affirmatively and unequivocally). Because the right to a public trial is a right guaranteed to defendants in the same provision of the state constitution that guarantees the right to a trial by jury, it logically follows that the waiver of that right must be as express as that for waiver of a jury. In my view, the burden is on the trial judge to make certain that the defendant has affirmatively waived this constitutional right before taking it away from him. Easterling, 157 Wash.2d at 176, 137 P.3d 825. That waiver should be "knowing, voluntary, and intelligent." Acrey, 103 Wash.2d at 208-09, 691 P.2d 957. Regrettably, the trial judge failed to inform Momah of his right to a public trial and failed to provide him with the opportunity to object to the closure.
¶ 51 Lastly, I must observe that a new trial is not a "windfall" for anyone when public trial rights are set aside for the sake of expediency. When a trial is closed without the benefit of a Bone-Club analysis, there is a high risk of violating public trial rights and damaging the public's trust of its courts. We must always remember the "constitutional requirement that justice be administered openly is not just a right held by the defendant. It is a constitutional obligation of the courts [and] is integral to our system of government." Easterling, 157 Wash.2d at 187, 137 P.3d 825 (Chambers, J., concurring). As Justice Chambers said in his concurrence in Easterling:
"The open operation of our courts is of utmost public importance. Justice must be conducted openly to foster the public's understanding and trust in our judicial system and to give judges the check of public scrutiny. Secrecy fosters mistrust. This openness is a vital part of our constitution and our history. The right of the public, including the press, to access trials and court records may be limited only to protect significant interests, and any limitation must be carefully considered and specifically justified."
Id. at 185, 137 P.3d 825 (quoting Dreiling v. Jain, 151 Wash.2d 900, 903-04, 93 P.3d 861 (2004)).
¶ 52 Justice Chambers went on to say:
Our constitution requires that justice be administered openly in courtrooms just as much as it must be reflected in open court records. Fidelity to the constitution requires *334 some meaningful remedy if a courtroom is improperly closed.
. . . .
.... I completely agree ... that there may be a case, there may be many cases, where substantive justice to the parties was done behind locked doors. Defendants themselves might even want the courtrooms closed for many rational reasons. But whether or not the defendant got due process of law is a completely different question from whether our article I, section 10 was violated. While a defendant may not herself be harmed by a hearing in a closed courtroom, there is no case where the harm to the principle of openness, as enshrined in our state constitution, can properly be described as de minimis. Thus, I cannot agree that there could ever be a proper exception to the principle that a courtroom may be closed without a proper hearing and order.
Id. at 185-86, 137 P.3d 825 (citing Orange, 152 Wash.2d at 806-07, 100 P.3d 291).

IV
¶ 53 From the record we have, there appears to be no justification for closing the courtroom to the public. If there was a valid reason for doing so, it is not apparent from the record because the trial judge did not perform a Bone-Club analysis prior to closing the courtroom. Neither did he make formal findings or conclusions justifying the closure. Thus, it is impossible to know exactly what motivated the trial judge's decision to partially close voir dire. While it may appear to some that a new trial is a steep price to pay for the closure of the courtroom for a portion of a trial, the expense of a retrial pales in comparison to the harm done to the constitutionally guaranteed right to have justice in this state administered openly.
¶ 54 For the foregoing reasons, I dissent.
WE CONCUR: SANDERS and CHAMBERS, JJ.
NOTES
[1] A review of the record indicates that most of the questions the court and counsel asked jurors concerned their prior knowledge of the case resulting from media publicity.
[2] In order to facilitate appellate review, the better practice is to apply the five guidelines and enter specific findings before closing the courtroom.
[*] Judge Joel M. Penoyar is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] The public trial right extends to jury selection. State v. Easterling, 157 Wash.2d 167, 174, 137 P.3d 825 (2006).
[2] The five requirements of the test are as follows:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a "serious and imminent threat" to that right.
"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
"4. The court must weigh the competing interests of the proponent of closure and the public.
"5. The order must be no broader in its application or duration than necessary to serve its purpose." Bone-Club, 128 Wash.2d at 258-59, 906 P.2d 325 (alteration in original) (quoting Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 210-11, 848 P.2d 1258 (1993)).
[3] In total, 17 jurors were questioned privately, 13 in chambers, and 4 in the jury room.
[4] In his concurrence, Justice Pro Tempore Penoyar suggests that there is "`[n]o harm, no foul'" because there is no indication that anyone wishing to attend the court proceedings was excluded. Concurrence at 329. Whether members of the public or the media were present would not necessarily be reflected in the record. Furthermore, if there were people in the courtroom when the closure decision was made, they may not have known that they had the right to object. It is clear that the trial judge did not inform anyone of their right in that regard. See Bone-Club, 128 Wash.2d at 261, 906 P.2d 325 (noting that "an opportunity to object holds no `practical meaning' unless the court informs potential objectors of the nature of the asserted interests" (quoting Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 39, 640 P.2d 716 (1982))).
[5] Unlike the majority, I will not speculate as to whether Momah received a fair trial after the trial judge inappropriately closed the courtroom without performing a Bone-Club analysis.