IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

THE STATE OF WASHINGTON,

Respondent,

v.

NORMAN MACY EYLE,

Appellant.

No. 78010-7-I

UNPUBLISHED OPINION

FILED: September 16, 2019

SCHINDLER, J. — Norman Macy Eyle appeals his conviction for domestic violence assault in the second degree of Amanda Oliver. Eyle claims three unrecorded conferences violated his right to an open and public trial, the trial court improperly admitted Oliver's statements to a medical provider under ER 803(a)(4), and the statements violated his Sixth Amendment right of confrontation. We affirm.

## FACTS

Amanda Oliver called 911 the morning of January 21, 2016. Oliver told the 911 operator, "He hit me in the head. . . . I'm bleeding a lot. . . . I need some help." Upon arriving, officers found Oliver "down on all fours" in the middle of a gravel road. Oliver was "crying uncontrollably" and had "[a] lot of blood" in her hair. Oliver appeared to be intoxicated. Oliver told officers, " 'He hit me with a bat.' " Oliver refused to identify who hit her by name but told the officers that "he" was "[i]n the house."

Other individuals told the police that Norman Macy Eyle "hit" Oliver "with a bat" and that he was in a nearby house with other people and a baby.

The officers saw a trail of blood leading to the front door of the nearby house. The police officers knocked and repeatedly announced their presence. No one responded. While looking through a front window, the officers could see blood on the floor inside the house. Concerned about the safety of the occupants, the police entered the house. Officers escorted Eyle's mother and three other family members outside. While checking the home for other occupants, the police found Eyle lying on a makeshift bed in the closet of the master bedroom. The police found blood and a bloody metal baseball bat on the bedroom floor. Eyle had blood on his clothes.

The State charged Eyle with domestic violence assault in the second degree of Oliver. Oliver did not testify at trial.

The court admitted into evidence the 911 call from Oliver. The State played the 911 call for the jury. Nurse Holly Ornes testified. Ornes examined Oliver in the emergency room. Ornes testified that Oliver said she "was hit in the head with a baseball bat" and " 'her boyfriend did this.' "

Eyle testified he was asleep at his mother's house when his girlfriend Amanda Oliver came in "[d]runk and mad." Eyle said Oliver grabbed a bat that was on the floor and hit him twice on the front of his head, causing bumps but no bleeding. Eyle testified that after Oliver hit him with the baseball bat, "I had my hands on the bat and we were both trying to pull it away from each other and I shoved, she fell." According to Eyle, Oliver cut her head when she fell. Eyle said his mother told Oliver to leave and he went back to sleep.

2

The jury convicted Eyle as charged. The trial court sentenced Eyle to a low-end standard-range sentence of three months confinement and 12 months community custody.

ANALYSIS

Public Trial

Eyle claims the trial court violated his right to a public trial by engaging in three unrecorded evidentiary conferences in the hallway outside the courtroom. The State argues there was no public trial right violation, Eyle invited any error, and any closure was de minimis. The record supports the State's argument.

Whether a defendant's right to a public trial has been violated is a question of law that we review de novo. State v. Easterling, 157 Wn.2d 167, 173-74, 137 P.3d 825 (2006). The state and federal constitutions guarantee a criminal defendant the right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art. 1, §§ 10, 22. "These provisions assure a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny." State v. Duckett, 141 Wn. App. 797, 803, 173 P.3d 948 (2007) (citing State v. Brightman, 155 Wn.2d 506, 514, 122 P.3d 150 (2005)). "While the right to a public trial is not absolute, it is strictly guarded to assure that proceedings occur outside the public courtroom in only the most unusual circumstances." State v. Strode, 167 Wn.2d 222, 226, 217 P.3d 310 (2009) (citing Easterling, 157 Wn.2d at 174-75).

We engage in a three-part inquiry to determine whether the trial court violated the defendant's right to a public trial: (1) whether the proceeding at issue " 'implicate[s] the public trial right' "; (2) if so, whether the proceeding was " 'closed' "; and (3) if so,

3

whether the closure was " 'justified.' " State v. Whitlock, 188 Wn.2d 511, 520, 396 P.3d 310 (2017) (quoting State v. Smith, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). "The appellant carries the burden on the first two steps; the proponent of the closure carries the third." State v. Love, 183 Wn.2d 598, 605, 354 P.3d 841 (2015).

Washington courts apply the experience and logic test to determine whether a particular proceeding implicates the public trial right. Smith, 181 Wn.2d at 514. The " 'experience prong' " of this test asks " 'whether the place and process have historically been open to the press and general public.' " Smith, 181 Wn.2d at 514[1] (quoting State v. Sublett, 176 Wn.2d 58, 73, 292 P.3d 715 (2012)[2]). The " 'logic prong' " asks " 'whether public access plays a significant positive role in the functioning of the particular process in question.' " Smith, 181 Wn.2d at 514[3] (quoting Sublett, 176 Wn.2d at 73). "The guiding principle is 'whether openness will enhance[ ] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.' " Smith, 181 Wn.2d at 514-15[4] (quoting Sublett, 176 Wn.2d at 75).

In Smith, the Washington Supreme Court held sidebar conferences do not implicate the public trial right "because they have not historically been open to the public and because allowing public access would play no positive role in the proceeding." Smith, 181 Wn.2d at 511. The court defined "proper sidebars" as proceedings that "deal with the mundane issues implicating little public interest." Smith, 181 Wn.2d at

---

[1] Internal quotation marks omitted.
[2] Plurality opinion.
[3] Internal quotation marks omitted.
[4] Alteration in original; internal quotation marks omitted.

516 (citing State v. Wise, 176 Wn.2d 1, 5, 288 P.3d 1113 (2012)). The court notes sidebars "must be limited in content to their traditional subject areas, should be done only to avoid disrupting the flow of trial, and must either be on the record or be promptly memorialized in the record." Smith, 181 Wn.2d at 516 n.10.

In Smith, the court concluded sidebars that were held in the hallway outside the courtroom to address evidentiary issues did not implicate the public trial right. Smith, 181 Wn.2d at 519, 512. "[E]videntiary rulings that are the subject of traditional sidebars do not invoke any of the concerns the public trial right is meant to address regarding perjury, transparency, or the appearance of fairness." Smith, 181 Wn.2d at 518. The sidebars were also contemporaneously memorialized and recorded, "thus negating any concern about secrecy." Smith, 181 Wn.2d at 518. Because the sidebars did not implicate the public trial right, there was no need to consider whether a closure occurred or whether the closure was justified. Smith, 181 Wn.2d at 519.

Pretrial, defense counsel requested the court allow evidentiary sidebars "in the event the State believes that the Defense has opened the door to admissibility of evidence despite the Court's order on motions in limine." The court granted the motion but encouraged counsel to "anticipate that in some way to build these discussions around natural breaks in the trial."

The first sidebar occurred during direct examination of King County Sheriff Deputy Taylor Jermstad. The prosecutor asked Deputy Jermstad whether he asked Oliver if Eyle said anything when he hit her with the baseball bat. Defense counsel objected and requested a sidebar. The trial court told the jury:

> All right. Here's the situation. We have an evidentiary issue that is being raised and I'm going to need to resolve it outside of your presence. But

rather than asking the 14 of you to leave the courtroom once again, the three of us are going to step outside momentarily so that I can get more information on the situation. And we'll be right back so everyone hold tight. If you'd like to stand up and stretch you're welcome to do it but I'd ask you to stay put in the jury box.

We'll be off the record momentarily.

The record indicates an "[o]ff the record sidebar from 3:06 to 3:10" p.m. When the parties returned, the court stated on the record that it had overruled defense counsel's objection. Without taking a break, the prosecutor and defense counsel completed examination and cross-examination of Deputy Jermstad and another witness. After excusing the jury for the day, at 3:56 p.m., the court memorialized in detail the content of the sidebar on the record. The court specified that "the basis for the defendant's objection was that the question incorporated hearsay statements for which there was no exception." The court invited counsel to supplement the court's summary of the sidebar on the record.

The second sidebar occurred the following day during direct examination of Deputy Susanne Aagerup. When the prosecutor asked Deputy Aagerup whether Oliver made any statements to her, defense counsel objected and requested a sidebar. The court again explained to the jury that the matter would be discussed briefly outside the courtroom. The record indicates an "[o]ff the record sidebar from 9:43 to 9:46" a.m. When the parties returned, the prosecutor resumed questioning Deputy Aagerup. At 9:59 a.m., the court recessed and memorialized the sidebar for the record. The court stated that the matter concerned whether evidence of Oliver's statement to Deputy Aagerup should be excluded as cumulative, whether the defense had notice, and whether the statement fell under the excited utterance hearsay exception.

6

The third sidebar occurred later the same day during the State's cross-examination of Eyle. After questioning Eyle about the bloody baseball bat, the prosecutor stated he would "need a brief sidebar to kind of get into what we're going to talk about next." The court told the jury that it would hear the matter in the hallway. The record indicates an "[o]ff the record sidebar from 2:37 to 2:41" p.m. The prosecutor resumed cross-examination of Eyle. After the defense rested, the court excused the jury. At 2:52 p.m., the court memorialized the third sidebar. The issue concerned whether Eyle's testimony opened the door to admit previously excluded telephone calls that Eyle made to his mother from jail after his arrest and statements Eyle made to deputies at the time of arrest. The court ruled there was "no opening of the door to revisit the exclusion of those statements."

Eyle relies on Whitlock to argue the three sidebars violated his public trial right. Whitlock is distinguishable. In Whitlock, the Washington Supreme Court held that an unrecorded 10-minute discussion in chambers about the scope of cross-examination of a confidential informant during a bench trial violated the defendant's public trial right. Whitlock, 188 Wn.2d at 516, 522-23. The court reiterated "proper sidebars" are those that (1) " 'deal with the mundane issues implicating little public interest,' " (2) are " 'done only to avoid disrupting the flow of trial,' " and (3) are " 'promptly memorialized in the record.' " Whitlock, 188 Wn.2d at 522 (quoting Smith, 181 Wn.2d at 516 & n.10). The court held that the proceeding was an intentional courtroom closure, not a proper sidebar. Whitlock, 188 Wn.2d at 523-24. First, the conference occurred in chambers and chambers are by definition closed to the public. Whitlock, 188 Wn.2d at 522. Second, the sidebar conference was not recorded or promptly memorialized. Whitlock,

188 Wn.2d at 522. Third, because the proceeding took place during a bench trial, "[t]he entire objection could have been argued on the record at any time with no inconvenience to anyone." Whitlock, 188 Wn.2d at 523. And finally, the objection "was about a matter easily accessible to the public: informants and their motives to curry favor with authority." Whitlock, 188 Wn.2d at 523.

Here, unlike in Whitlock, the sidebars took place in a public hallway outside the courtroom, not in the court's private chambers; and all three sidebars addressed evidentiary rulings, a subject of traditional sidebars to which the public trial right does not attach. Eyle contends it is impossible to know the exact substance of the conferences because the court did not promptly memorialize the unrecorded conferences on the record. The record does not support his argument. The record shows the court avoided disrupting the trial by memorializing each sidebar discussion at the earliest opportunity during the next break in the trial. The court memorialized the sidebars in detail and invited the parties to supplement the record. Eyle has not demonstrated that the sidebar discussions implicated his public trial right.

We also conclude the invited error doctrine applies. See In re Pers. Restraint of Salinas, 189 Wn.2d 747, 755, 408 P.3d 344 (2018) (citing In re Pers. Restraint of Coggin, 182 Wn.2d 115, 340 P.3d 810 (2014)). "The basic premise of the invited error doctrine is that a party who sets up an error at trial cannot claim that very action as error on appeal and receive a new trial." State v. Momah, 167 Wn.2d 140, 153, 217 P.3d 321 (2009), cert. denied, 562 U.S. 837, 131 S. Ct. 160, 178 L. Ed. 2d 40 (2010). Here, the court granted the defense motion to allow evidentiary sidebars. Defense counsel requested two of the three sidebars during trial and did not object to the third sidebar.

Defense counsel also did not object to the location or timing of memorializing the sidebars on the record.

Right To Confront Witnesses

Eyle argues that permitting emergency room nurse Ornes to testify that Oliver said her " 'boyfriend did this' " violated his constitutional right of confrontation. We review alleged confrontation clause violations de novo. State v. Jasper, 174 Wn.2d 96, 108, 271 P.3d 876 (2012). The Sixth Amendment confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause "bars 'admission of testimonial statements of a witness who did not appear at trial unless [s]he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (quoting Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). But "not all out-of-court statements give rise to the protections of the confrontation right because not all speakers are acting as a 'witness' against the accused as described in the Sixth Amendment." State v. Wilcoxon, 185 Wn.2d 324, 325, 373 P.3d 224 (2016) (citing Crawford, 541 U.S. at 51). Only testimonial statements are subject to the confrontation clause. Davis, 541 U.S. at 821.

In State v. Scanlan, ___ Wn.2d ___, 445 P.3d 960 (2019), the Washington Supreme Court addressed whether statements to medical providers violate the right to confrontation. The court held the primary purpose test governs the analysis: whether " 'in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to creat[e] an out-of-court substitute for trial testimony.' " Scanlan,

9

445 P.3d at 966-67[5] (quoting Ohio v. Clark, ___ U.S. ___, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015)). Under the primary purpose test, we "objectively evaluate the circumstances in which the encounter occurs, as well as the parties' statements and actions." Scanlan, 445 P.3d at 966 (citing Michigan v. Bryant, 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011)). A statement is testimonial if its primary purpose is to " 'establish or prove past events potentially relevant to later criminal prosecution,' " to " 'investigate a possible crime,' " to " 'create a record for trial,' " or to create or gather evidence for prosecution. Scanlan, 445 P.3d at 966-67 (quoting Davis, 547 U.S. at 822, 830; Bryant, 562 U.S. at 358; Clark, 135 S. Ct. at 2181, 2183). The court concluded statements made to medical personnel "are 'significantly less likely to be testimonial than statements given to law enforcement officers' because medical personnel are 'not principally charged with uncovering and prosecuting criminal behavior.' " Scanlan, 445 P.3d at 967 (quoting Clark, 135 S. Ct. at 2182).

The record shows Oliver made the statement to Ornes under circumstances that objectively indicate the primary purpose of the conversation was medical treatment, not to investigate a possible crime or provide evidence for a criminal prosecution. When the police arrived, Oliver was bleeding from a three- to four-inch laceration on the back of her head. Oliver made the challenged statement to emergency room triage nurse Ornes and did not identify Eyle by name. On direct examination, nurse Ornes testified:

> Q. Okay. All right. So now, you had mentioned earlier that you had done triage for Ms. Oliver; is that correct?
> A. Yes.
> Q. What is triage?
> A. Triage is basically the sorting of patients. So it's an old military term actually, but it's the first clinical kind of — I can't think of the word —

---

[5] Alteration in original, internal quotation marks omitted.

the first clinical meeting of the patient and a medical provider, a nurse.

Q. All right. And what's the goal of kind of this triage procedure? What is your goal during all of that?

A. So my goal is to get a brief story about why the person is there and then be able to appropriately kind of assign a severity index, so how sick or ill are they and where do they need to go and do I need to do something emergently.

. . . .

Q. All right. Which you're doing — you know, you're kind of talking about triage and trying to figure out exactly what was going on. What are some of the questions that you ask typically? I mean, what are some of the important kind of information to gather at that point?

A. Well, there's — I mean, we have various specific questions that we ask every single patient. So we ask them what happened, what brought them in for their visit, and then depending on whatever that answer is will lead us to other questions; we take a set of vital signs, blood pressure, and heart rate; we ask about medical history, social history.

. . . .

Q. All right. Now, did she state how she received her injury?

A. She — on here she states that according to her that she was hit in the head with a baseball bat.

Q. Okay. Did she say —

A. Metal bat actually. Sorry.

Q. All right. And did she say who did that?

A. She did. She writes patient — or I write, "Patient states that her boyfriend did this."

Because the primary purpose of the conversation was to assess the seriousness of the injury and provide treatment, Ornes' testimony did not violate the confrontation clause.

Hearsay Exception for Medical Diagnosis or Treatment

Eyle also argues the trial court erred in admitting Oliver's statement under the hearsay exception for the purpose of medical diagnosis or treatment, ER 803(a)(4). We review decisions on the admissibility of evidence under an abuse of discretion standard. State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997).

11

Under ER 803(a)(4), statements made for purposes of medical diagnosis or treatment are admissible. ER 803(a)(4) provides:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

"To be admissible, the declarant's apparent motive must be consistent with receiving treatment, and the statements must be information on which the medical provider reasonably relies to make a diagnosis." State v. Fisher, 130 Wn. App. 1, 14, 108 P.3d 1262 (2005). Such statements are deemed reliable because patients have an incentive to be truthful in order to receive proper care. State v. Doerflinger, 170 Wn. App. 650, 664, 285 P.3d 217 (2012).

The State asserts Eyle failed to properly preserve this claim for appellate review. The record supports the State's argument.

"The appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a).

> We will not reverse the trial court's decision to admit evidence where the trial court rejected the specific ground upon which the defendant objected to the evidence and then, on appeal, the defendant argues for reversal based on an evidentiary rule not raised at trial.

State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). This is because "[f]ailure to object deprives the trial court of this opportunity to prevent or cure the error." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).

Before trial, the State moved to admit Oliver's statements to Ornes under ER 803(a)(4). Eyle moved to exclude "any prior out-of-court statements by the alleged victim and other witnesses" as inadmissible hearsay under ER 802, but he did not argue

12

any of the statements were inadmissible under ER 803(a)(4). At the hearing on pretrial motions, defense counsel acknowledged that Oliver's statement "may technically qualify for the medical records exception." But defense counsel argued the statement was inadmissible because Ornes had no independent recollection of treating Oliver, there was a significant time lapse between the incident and Oliver's statement, and admission would violate Eyle's right of confrontation. The court ruled Oliver's statement that " 'her boyfriend did this' " was nontestimonial and admissible under ER 803(a)(4).[6] Eyle's failure to object on this specific ground precludes review of the alleged error.

We affirm the conviction for domestic violence assault in the second degree.

Schindler, J.

WE CONCUR:

Mann, ACJ

---

[6] The court did not allow Ornes to testify about Oliver's "statement as to previous assault by her boyfriend" or about notifying the police and social workers. The court ruled those statements were not for medical diagnosis and were more prejudicial than probative.