[No. 37086-7-II.   Division Two.   November 10, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL LEE LEYERLE, *Appellant*.

476

*Lisa E. Tabbut*, for appellant.

*Susan I. Baur, Prosecuting Attorney*, and *Amie L. Hunter, Deputy*, for respondent.

¶1 VAN DEREN, J. — Michael Lee Leyerle appeals his conviction for unlawful possession of methamphetamine, asserting that the trial court improperly conducted a portion of voir dire outside of the courtroom and, therefore, a new trial is warranted. We agree, reverse Leyerle's conviction for unlawful possession of methamphetamine, and remand for further proceedings.

## FACTS

¶2 The State charged Leyerle with unlawful possession of methamphetamine on November 16, 2007.[1] During voir dire, the trial court asked if any jurors felt that they could not be impartial if they were to be on Leyerle's jury. When a prospective juror indicated that he could not be impartial, the trial court asked the prospective juror and both counsel to join him in the hallway. The hallway discussion between the trial judge, prosecutor, defense counsel, and the prospective juror was recorded.[2] The trial judge asked defense counsel if Leyerle wanted to join them in the hallway. Defense counsel's response was inaudible and not recorded, but later, before they returned to the courtroom, the trial judge stated, "There were no spectators who waived their right to be here[; defendant] doesn't want to be here and his counsel said [he] didn't want to be here. Isn't that correct?" Report of Proceedings (RP) Voir Dire at 20. Defense counsel responded affirmatively.

¶3 In the hallway, the prospective juror explained that, based on his many years as a law enforcement officer in California, "[he] would be prejudic[ed] towards the law enforcement side." RP Voir Dire at 19. Defense counsel successfully challenged the prospective juror for cause. Also in the hallway, defense counsel noted that he had had "[a]lmost twenty-five years of pretty constant contact" with another potential juror. RP Voir Dire at 21. The State said it would question the juror about those contacts and later did so in open court.

¶4 The trial judge, prosecutor, defense counsel, and the prospective juror then returned to the courtroom. The trial court excused the prospective juror. Then, voir dire resumed

---

[1] The trial court dismissed a second charge and that determination is not before us on appeal.

[2] The means of this recording is not in the record but the parties explained at oral argument that events in a hallway can be videotaped and audio recorded.

and a jury was seated that ultimately convicted Leyerle of unlawful possession of methamphetamine.

¶5 Leyerle appeals, arguing that the trial court erred by conducting a portion of voir dire outside the courtroom.[3]

## ANALYSIS

¶6 We note at the outset that our recent decision in *State v. Paumier*, 155 Wn. App. 673, 230 P.3d 212, *review granted*, 169 Wn.2d 1017, 236 P.3d 206 (2010) resolves this case. We adhere to and apply *Paumier* to Leyerle's appeal.

¶7 Whether a trial court procedure violates the right to a public trial is a question of law we review de novo. *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005). The remedy for such a violation is reversal and remand for a new trial. *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 814, 100 P.3d 291 (2004). A defendant who fails to object at the time of the closure does not waive the right. *Brightman*, 155 Wn.2d at 514-15.

¶8 The state and federal constitutions guarantee the right to a public trial. Article I, section 22 of the Washington State Constitution provides, "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial." The Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Moreover, article I, section 10 of the Washington State Constitution provides that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." This provision secures the public's right to open and accessible proceedings. *State v. Easterling*, 157 Wn.2d 167, 174, 137

---

[3] On November 21, 2008, we ordered proceedings stayed pending our Supreme Court's decisions in *State v. Strode*, No. 80849-0, and *State v. Momah*, No. 81096-6, addressing the public trial issue. On October 8, 2009, our Supreme Court issued its decisions in *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009) and *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009). We lifted the stay on October 29, 2009, and ordered the parties to provide supplemental briefing on the impact of *Strode* and *Momah* on this case. The parties have provided that briefing and we now consider Leyerle's appeal.

P.3d 825 (2006). These provisions ensure a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny. *Brightman*, 155 Wn.2d at 514; *Dreiling v. Jain*, 151 Wn.2d 900, 903-04, 93 P.3d 861 (2004). While the public trial right is not absolute, it is strictly guarded to ensure that proceedings occur outside the public courtroom in only the most unusual circumstances. *Easterling*, 157 Wn.2d at 174-75; *Orange*, 152 Wn.2d at 804-05; *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).

¶9 The guaranty of open criminal proceedings extends to voir dire. *Orange*, 152 Wn.2d at 804. In *Orange* and *Bone-Club*, our Supreme Court set out the standards for closing all or any portion of a criminal trial. *Orange*, 152 Wn.2d at 800, 805; *Bone-Club*, 128 Wn.2d at 258-59. *Bone-Club* adopted a five-part analysis designed to protect a criminal defendant's right to a public trial.[4] 128 Wn.2d at 258-60; *see also Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 36-39, 640 P.2d 716 (1982) (setting forth five-part analysis under the Washington State Constitution article I, section 10).

¶10 Our Supreme Court has explained that *Bone-Club*'s "five-step closure test" is essentially a restatement and adoption of the federal closure criteria expressed in *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31

---

[4] The *Bone-Club* analysis provides:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a serious and imminent threat to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

"5. The order must be no broader in its application or duration than necessary to serve its purpose."

128 Wn.2d at 258-59 (alteration in original) (internal quotation marks omitted) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)).

(1984).[5] *See Orange*, 152 Wn.2d at 805-07; *see also Bright-man*, 155 Wn.2d at 515 n.5. As we explained in *Paumier*, "[O]ur Supreme Court [in *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009),] seemed to back away from its earlier articulation in *Orange* that application of the *Bone-Club* guidelines is required and that the failure to so employ them when closing the courtroom is reversible error." 155 Wn. App. at 680.

¶11 *Momah* purportedly relied on *Waller* in concluding that a new trial was not warranted where the trial court closed voir dire without applying the *Bone-Club* criteria. The *Momah* court opined that "the [*Waller*] Court required a showing that the defendant's case was actually rendered unfair by the closure." 167 Wn.2d at 150.

¶12 In *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009), *Momah*'s companion case, the lead opinion reiterated and applied *Orange*'s conclusion—that the trial court *must* employ the *Bone-Club* criteria *before* any courtroom closure and the failure to employ that criteria is reversible error. *See* 167 Wn.2d at 227-28. But *Strode* was a plurality decision published the same day as *Momah*, thus leaving unclear whether the *Bone-Club* criteria was a prerequisite for courtroom closure.[6] *See Paumier*, 155 Wn. App. at 679-83.

---

[5] The *Waller* standards require:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. at 48.

[6]

> The presumption that trials should be open may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." To assure careful, case-by-case analysis of a closure motion, a trial court faced with the question of whether a portion of a trial should be closed must ensure that the . . . five [*Bone-Club*] criteria are satisfied.

*Strode*, 167 Wn.2d at 227 (citations omitted) (internal quotation marks omitted) (quoting *Orange*, 152 Wn.2d at 806).

¶13 Shortly after *Momah* and *Strode* were issued, the United States Supreme Court decided *Presley v. Georgia*, ___ U.S. ___, 130 S. Ct. 721, 723, 175 L. Ed. 2d 675 (2010), holding that under the First and Sixth Amendments, voir dire of prospective jurors *must* be open to the public and that this requirement is "binding on the States." *See also Paumier*, 155 Wn. App. at 683-86. *Presley* made clear that *Waller* provided the appropriate standards for courts to apply before excluding the public from any stage of a criminal trial. *Presley*, 130 S. Ct. at 724.

¶14 Noting that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials," *Presley*, 130 S. Ct. at 725, the Court reiterated that " '[a]bsent consideration of alternatives to closure, the trial court could not constitutionally close the *voir dire.*' " *Presley*, 130 S. Ct. at 724 (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 511, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984)). Moreover, "trial courts are required to consider alternatives to closure even when they are not offered by the parties" because "[t]he public has a right to be present whether or not any party has asserted the right." *Presley*, 130 S. Ct. at 724-25. Additionally, the trial court must make appropriate findings supporting its decision to close the proceedings. *Presley*, 130 S. Ct. at 725.

¶15 *Presley* held that "even assuming, *arguendo*, that the trial court had an overriding interest in closing *voir dire*, it was still incumbent upon it to consider all reasonable alternatives to closure." *Presley*, 130 S. Ct. at 725. Thus, where the trial court fails to sua sponte consider reasonable alternatives and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction. *Presley*, 130 S. Ct. at 725. As we held in *Paumier*, "*Presley*, applying the federal constitution, resolves any question about what a trial court must do before excluding the public from trial proceedings, including voir dire." 155 Wn. App. at 685.

¶16 In his supplemental briefing, Leyerle, as did Paumier, argues that his case is factually more like *Strode* than it is like *Momah*. The State contends otherwise. Such debate is of no significance, however, because as we acknowledged in *Paumier*, *Presley* has eclipsed *Momah* and *Strode* and controls the outcome of this case.[7]

¶17 The State contends that Leyerle waived any courtroom closure issue when defense counsel acknowledged that Leyerle did not wish to be present during the prospective juror's interview in the hallway. We disagree. As our Supreme Court reiterated in *Strode*, "[A] 'defendant's failure to lodge a contemporaneous objection at trial [does] not effect a waiver.'" 167 Wn.2d at 229 (second alteration in original) (quoting *Brightman*, 155 Wn.2d at 517). "[Defendant]'s failure to object to the closure or his counsel's participation in closed questioning of prospective jurors did not . . . constitute a waiver of his right to a public trial."[8] *Strode*, 167 Wn.2d at 229.

---

[7] As our Supreme Court has observed in another context, "[United States] Supreme Court application of the United States Constitution establishes a floor below which state courts cannot go." *State v. Sieyes*, 168 Wn.2d 276, 292, 225 P.3d 995 (2010) (addressing the right to bear arms under article I, section 24 of the Washington State Constitution and the Second Amendment). That tenet applies equally here.

[8] Moreover, a defendant's right to a public trial can be waived only in a "knowing, voluntary, and intelligent manner." *Strode*, 167 Wn.2d at 229 n.3. Here, the record is silent about whether a colloquy, writing, or other personal expression by Leyerle indicated that he knowingly, voluntarily, and intelligently waived his right to participate in voir dire of the prospective juror. While such failure would apparently provide yet another basis for reversing Leyerle's conviction, we need not belabor that matter in light of our determination that *Presley*'s requirements resolve this case.

We do note, however, that the dissent misconstrues the record on a related point when it states that "Leyerle was not excluded; rather, he chose to stay in the courtroom on the recommendation of his counsel. I VRP at 20." Dissent at 490. The record is silent on whether counsel so advised the defendant or whether Leyerle was otherwise advised of his right to be present. Addressing a similar circumstance, Division Three opined in *State v. Duckett*:

Here, the court never advised Mr. Duckett of his public trial right or asked him to waive it. He certainly could not then make a knowing, intelligent, and voluntary waiver of this constitutional right. While Mr. Duckett was told he had the right to be present during individual questioning of the selected jurors, and validly waived that right, that is all he waived. We disagree that he "presumably was aware of the right to have the public present" and impliedly waived it,

¶18 Additionally, a defendant "cannot waive the public's right to open proceedings." *Strode*, 167 Wn.2d at 229. This is so because "the public also has a right to object to the closure of a courtroom, and the trial court has the independent obligation to perform a *Bone-Club* analysis." *Strode*, 167 Wn.2d at 229-30. "The public has a right to be present whether or not any party has asserted the right," thus trial courts are required to consider alternatives to closure even when the parties do not offer such alternatives. *Presley*, 130 S. Ct. at 724-25.

¶19 The State also contends, and the dissent agrees, that "[t]here is nothing to indicate that the hallway was not open to the public" and thus "there was no closure." Suppl. Br. of Resp't at 1; dissent at 488-90. But we have held that "conducting voir dire out of the courtroom constitutes a 'closure' that mandates *Bone-Club* analysis even when the trial court has not explicitly closed the proceedings." *State v. Heath*, 150 Wn. App. 121, 127, 206 P.3d 712 (2009) (citing *State v. Erickson*, 146 Wn. App. 200, 211, 189 P.3d 245 (2008)); *see also State v. Duckett*, 141 Wn. App. 797, 808, 173 P.3d 948 (2007) (even where only "a limited portion of voir dire was held outside the courtroom," that fact "does not excuse the [trial court's] failure to engage in a *Bone-Club* analysis"); *State v. Frawley*, 140 Wn. App. 713, 720, 167 P.3d 593 (2007). *But see State v. Momah*, 141 Wn. App. 705, 714, 171 P.3d 1064 (2007) (Division One holding that conducting voir dire outside of the courtroom absent an explicit order does not constitute a "closure"), *aff'd on other grounds*, 167 Wn.2d 140 (2009); *State v. Wise*, 148 Wn. App. 425, 436, 200 P.3d 266 (2009) (trial court was not required to sua sponte conduct *Bone-Club* analysis before temporary relocation of

---

when this right was never addressed. *See* Br. of Resp't at 9. Moreover, we question whether Mr. Duckett could waive the public's right to open proceedings. *Any closure of a public judicial proceeding required the trial court to engage in the* Bone-Club *analysis. That was not done here.*

141 Wn. App. 797, 806-07, 173 P.3d 948 (2007) (emphasis added). As in *Duckett*, the trial court here similarly failed to engage in required procedures before conducting a portion of voir dire outside the courtroom. Additionally, there is no evidence in the record that Leyerle received even the inadequate advisements that Duckett received.

voir dire to chambers for the purpose of asking prospective jurors sensitive questions). While there is disagreement among the noted decisions, *Heath, Erickson, Frawley*, and *Duckett* comport with *Presley*, and we adhere to those decisions.[9]

---

[9] The dissent opines that there was no closure here because the interview "took place in a public setting" and was recorded. Dissent at 489. But the record is silent regarding whether or to what extent the proceeding in the hallway was accessible by the public. And, in any event, in our view the presumptively appropriate public forum for proceedings in this case was the public courtroom. Again, we agree with *Duckett*, wherein Division Three opined:

[T]he State suggests that the courtroom was not in fact closed by the trial court's decision to interview the selected jurors in chambers. To the extent the State's argument is that the court did not enter a closure order, we look to the record to determine the presumptive effect of the court's directive. The trial judge stated she intended to interview the selected jurors in a jury room. The State bears the burden on appeal to show that, despite the court's ruling, a closure did not occur.

141 Wn. App. at 807 n.2 (citation omitted). Here, the State has not convincingly shown that proceedings removed from the public forum of the courtroom did not amount to a closure.

Nor does the recording of the hallway interview excuse the trial court's failure to follow required procedures before removing trial proceedings from the public forum of the courtroom. Separate questioning of potential jurors is routinely recorded, *see, e.g., Strode*, 167 Wn.2d at 224 n.1, and the mere existence of such recordings, and thus the public's potential ability to access those recordings through determined effort, plays no role in deciding whether a trial court has observed proper courtroom closure procedures. *See, e.g., Strode*, 167 Wn.2d at 223 (holding that the trial court violated defendant's right to a public trial by conducting a portion of jury selection in the trial judge's chambers "in unexceptional circumstances" without first performing the required *Bone-Club* analysis; such error was structural requiring reversal of defendant's conviction and remand for a new trial).

The dissent further notes there were no members of the public in the courtroom during the hallway voir dire of the potential juror. But that is not dispositive. Actual attendance by the public is not a precondition that triggers the trial court's duty to follow required courtroom closure procedures, which are intended to ensure that *all* public trial rights are protected. The burden to protect those rights resides with the trial court.

The conclusion that trial courts are required to consider alternatives to closure even when they are not offered by the parties is clear not only from this Court's precedents but also from the premise that "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." The public has a right to be present whether or not any party has asserted the right.

*Presley*, 130 S. Ct. at 724-25 (alteration in original) (citation omitted) (quoting *Press-Enter.*, 464 U.S. at 505). *Press-Enterprise*, upon which *Presley* relied, explained the importance of the rights involved and how they are to be protected as follows:

¶20 Finally, the State contends, and the dissent agrees, that any violation here of the public trial right was de minimis. Again, we disagree. As we previously stated in *Erickson*:

> We agree with the principle stated in *Duckett* that "the guaranty of a public trial under our constitution has never been subject to a de minim[i]s exception." 141 Wn. App. at 809. Even though one can articulate pragmatic and salutary reasons for moving voir dire outside the courtroom in certain circumstances, such a course of action requires the trial court to engage in a *Bone-Club* inquiry before doing so.

*Erickson*, 146 Wn. App. at 211. Similarly, our Supreme Court observed in *Strode* that it " 'has never found a public trial right violation to be [trivial or] de minimis.' " 167 Wn.2d at 230 (alteration in original) (quoting *Easterling*, 157 Wn.2d at 180); *see also Presley*, 130 S. Ct. at 724-25 (holding that it is the trial court's obligation to take every reasonable measure to accommodate public attendance at criminal trials, and absent that court's consideration of alternatives to closure, it could not constitutionally close voir dire).

> [H]ow we allocate the "right" to openness as between the accused and the public, or whether we view it as a component inherent in the system benefiting both, is not crucial. No right ranks higher than the right of the accused to a fair trial. But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness.
>
> . . . The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

464 U.S. at 508. The Court concluded:

> The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press-Enter.*, 464 U.S. at 510; *see also Strode*, 167 Wn.2d at 227 (quoting *Orange*, 152 Wn.2d at 806 (quoting *Waller*, 467 U.S. at 45 (quoting *Press-Enter.*, 464 U.S. at 510))).

¶21 As we held in *Paumier*, "*Presley*, applying the federal constitution, resolves any question about what a trial court must do before excluding the public from trial proceedings, including voir dire." 155 Wn. App. at 685. Similar to what occurred in *Paumier*, the trial court conducted a portion of voir dire outside the public forum of the courtroom. By doing so, without first considering alternatives to such closure of this portion of the voir dire proceedings and making appropriate findings explaining why such closure was necessary, the trial court violated Leyerle's and the public's right to an open proceeding. *Presley* requires reversal of Leyerle's conviction for unlawful possession of methamphetamine, and we so hold.[10]

---

[10] The dissent argues in part that *Presley* is distinguishable because the defendant therein objected to the trial court's closure of the courtroom during voir dire. Dissent at 492-96. In light of our Supreme Court's repeated holding that a defendant's failure to object does not waive the public trial right, we do not agree that the absence of an objection here is a valid basis for distinguishing *Presley*. *See Strode*, 167 Wn.2d at 229; *Brightman*, 155 Wn.2d at 517; *Bone-Club*, 128 Wn.2d at 257.

The dissent also contends that *Presley* does not create a bright-line rule. But *Presley* speaks in broad terms, drawing on the Supreme Court's First and Sixth Amendment precedent to hold that when a trial court closes voir dire it *must* first apply *Waller*'s closure criteria and the failure to do so requires reversal. *See Presley*, 130 S. Ct. at 724-25 (applying *Waller* and *Press-Enter.*).

The dissent contends that *Presley* does not overrule *Waller* and focuses on the remedy employed in *Waller*, which was remanded for a new suppression hearing rather than a new trial and which the *Waller* Court held was a remedy "appropriate to the violation." *Waller*, 467 U.S. at 50. But *Presley* explains how *Waller* is to be applied in the voir dire context. Indeed, *Presley* relied on and applied *Waller* in holding that in the context of courtroom closure during voir dire, the appropriate remedy is reversal where the trial court fails to first apply the *Waller* criteria. *See Presley*, 130 S. Ct. at 724-25.

Finally, the dissent contends that *Presley* is limited to its specific facts, particularly the fact that the defendant therein objected to the trial court's excluding defendant's uncle from the courtroom during voir dire. Dissent at 492-94. But nowhere in the *Presley* decision does the Supreme Court specifically link its holding, reversing and remanding for a new trial, to an "objection" prerequisite. *Presley* clearly holds that a trial court is obligated to first apply the *Waller* criteria before closing voir dire, and the trial court's failure to so act requires reversal and a new trial. *See Presley*, 130 S. Ct. at 724-25.

¶22 We reverse Leyerle's conviction and remand for further proceedings consistent with this opinion.[11]

BRIDGEWATER, J., concurs.

¶23 HUNT, J. (dissenting) — I respectfully dissent. On the record before us, I would hold that the separate voir dire of this one prospective juror was not closed to the public. But even if the majority is correct that this voir dire was closed to the public, I would hold that interviewing this sole biased juror for two minutes in the public hallway outside the courtroom, away from the rest of the venire remaining in the courtroom, does not warrant a new trial because it served the basic purposes of the right to a public trial: to ensure "a fair trial, foster public understanding and trust in the judicial system, and give judges the check of public scrutiny." Majority at 479 (citing *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005)). I would affirm.

I. SINGLE JUROR VOIR DIRE NOT CLOSED TO PUBLIC

¶24 Acknowledging that the trial court did not " 'explicitly close[ ] the proceedings,' " the majority nevertheless concludes that the trial court closed the juror voir dire to the public, Majority at 483 (quoting *State v. Heath*, 150 Wn. App. 121, 127, 206 P.3d 712 (2009) (citing *State v. Erickson*, 146 Wn. App. 200, 211, 189 P.3d 245 (2008)) and citing *State v. Frawley*, 140 Wn. App. 713, 720, 167 P.3d 593 (2007)). I disagree. Furthermore, although like the trial court here, the *Heath*, *Erickson*, and *Frawley* trial courts did not expressly close voir dire to the public, these three cases are distinguishable from this case.

¶25 *Frawley* and *Heath* involved voir dire of individual jurors in the judge's chambers. *Frawley*, 140 Wn. App. at

---

[11] We would normally order a new trial but, because the parties indicated at oral argument that they did not know whether Leyerle is still in custody on this conviction, we leave to the parties the pursuit of further proceedings as appropriate, which may include, for example, a new trial or a plea and credit for time served.

718; *Heath*, 150 Wn. App. at 124-25. In *Erickson*, the trial court conducted voir dire of individual jurors in the jury room after clearing the courtroom of all other prospective jurors. *Erickson*, 146 Wn. App. at 204. A judge's chambers and the jury room are usually private locations; thus, at most *Heath*, *Erickson*, and *Frawley* stand for the proposition that, even if the trial court does not explicitly close jury voir dire to the public, the voir dire is considered closed to the public if the trial court relocates the voir dire to a location typically considered private. In contrast, a public hallway outside a courtroom, such as the location of the short voir dire here, is not ordinarily considered private. Therefore, I respectfully disagree that *Heath*, *Erickson*, and *Frawley* control the outcome of Leyerle's case.

¶26 In my view, we should instead examine the particular facts of Leyerle's case to determine whether there was in fact a court closure, just as the United States Supreme Court has done in previous cases involving alleged violations of the right to a public trial.[12] Here, the record establishes that there was no member of the public in the courtroom when the trial court moved the single juror voir dire into the public hallway, *see* I Verbatim Report of Proceeding (VRP) at 19; similarly, nothing in the record even hints that any member of the public entered the courtroom during this two-minute interview or was excluded from the hallway voir dire.[13]

¶27 In further contrast with *Heath*, *Erickson*, and *Frawley*, the trial court here videotaped the juror interview, transcribed its four pages of the verbatim report of proceed-

---

[12] *See Waller v. Georgia*, 467 U.S. 39, 41-43, 48-49, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (noting inter alia the duration of the court closure, which parties objected to the closure, and the parties excluded from the closure); *see also Presley v. Georgia*, ___ U.S. ___, 130 S. Ct. 721, 722, 175 L. Ed. 2d 675 (2010).

[13] I agree with the majority's assertion that the absence of members of the public in the courtroom during the voir dire of one potential juror in the hallway outside the courtroom "is not dispositive." Majority at 484 n.9. But this case need not depend on this single fact. Instead, this fact together with other uncontroverted facts in the record, as set forth above, show that the public was not excluded from the videotaped, public hallway, voir dire of the single juror and, therefore, that the trial court did not close the voir dire of this juror to the public.

ings, and made it available for review by the public together with the rest of the trial record.[14] *See* I VRP at 19. Moreover, both counsel were present during this videotaped voir dire, together with the trial court and the sole prospective juror. I VRP at 19. Leyerle was not excluded; rather, he chose to stay in the courtroom on the recommendation of his counsel. I VRP at 20.

¶28 These undisputed facts show that this short, single juror voir dire took place in a public setting.[15] Accordingly, I disagree with the majority's conclusion that a court closure occurred in this case and I would uphold the trial court's action on this factual ground alone.

## II. LEYERLE IS NOT ENTITLED TO A NEW TRIAL

¶29 Assuming, however, without agreeing, that the voir dire of this single juror was closed to the public as a matter of law, *see* majority at 483-84, I do not agree with the majority that Leyerle is automatically entitled to a new trial simply because the trial court did not recite the *Bone-Club* factors[16] on the record.

---

[14] The majority further states that "recording of the hallway interview," standing alone, does not "excuse" the trial court. Majority at 484 n.9. I agree that in hindsight, it would have been helpful for the trial court to have made a more complete record about the details surrounding the hallway voir dire, including specific references to the presence or absence of the public in both the courtroom and the hallway outside the courtroom. But I disagree that we should not "excuse" the trial court from making a more detailed record about the openness of this procedure where (1) there do not appear to have been any members of the public excluded, (2) both parties agreed to the two-minute hallway voir dire of this one juror to prevent his tainting the other jurors, and (3) this procedure resulted in the trial court's excusing the biased juror for cause on Leyerle's motion.

Furthermore, I do not base this dissent on the single fact that this short voir dire was accessible to the public because it was videotaped. As I explain in the preceding footnote, several parts of the record taken together, not the single fact of the videotaping taken alone, show that the voir dire of this individual juror was not closed to the public.

[15] I respectfully disagree with the majority's contrary conclusion that "the record is silent regarding whether or to what extent the proceeding in the hallway was accessible by the public." Majority at 484 n.9. I further note that nothing in the record suggests that the public was excluded in any way from this two-minute, videotaped voir dire in the public hallway outside the courtroom.

[16] *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).

¶30 Nor do I agree with the bright-line rule that the majority advances: "[W]here the trial court fails to sua sponte consider reasonable alternatives and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction." Majority at 481 (citing *Presley v. Georgia*, ___ U.S. ___, 130 S. Ct. 721, 725, 175 L. Ed. 2d 675 (2010)). With all due respect, the cases on which the majority relies, *Waller*, *Presley*, and *Paumier*,[17] do not support this bright-line approach. Instead, the case law embraces a case-by-case approach that requires a "remedy ... appropriate to the violation," *Waller*, 467 U.S. at 50, which does not automatically involve reversal.[18] Under this case-by-case approach, Leyerle is not entitled to a new trial.

¶31 In addition to lacking case law support, in my view, the majority's approach is neither prudent nor necessary to advance the cause of justice. As the United States Supreme Court noted in *Waller*, the unnecessary grant of a new trial may create a "windfall for the defendant," which is "not in the public interest." *Waller*, 467 U.S. at 50. Such windfalls consume scarce judicial resources without providing any corresponding benefit to the public or to defendants who have already received fair trials. Furthermore, unnecessary new trials undermine "public understanding and trust in the judicial system" a core value inherent in the right to a public trial. Majority at 479 (citing *Brightman*, 155 Wn.2d at 514).

---

[17] *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984); *State v. Paumier*, 155 Wn. App. 673, 230 P.3d 212, *review granted*, 169 Wn.2d 1017, 236 P.3d 206 (2010).

[18] I agree with the majority that *Presley* holds that *Waller* articulates the appropriate standard for a trial court to apply when deciding whether to close any portion of a criminal trial to the public. *See* majority at 481; *see also Waller*, 467 U.S. at 45 (" 'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984))); *see also Bone-Club*, 128 Wn.2d at 260 (adopting the *Waller* standard).

## A. *Waller*

¶32 In *Waller*, the United States Supreme Court held that the appropriate relief for violating a defendant's right to a public trial under the Sixth Amendment to the United States Constitution is *not* an automatic grant of a new trial. *See Waller*, 467 U.S. at 49-50. As I noted above, "[r]ather, the remedy should be appropriate to the violation." *Waller*, 467 U.S. at 50.

¶33 The Sixth Amendment violation in *Waller* was grounded in the closure of the courtroom to the public during a suppression hearing, which closure the prosecution requested, and the trial court granted, over the defendant's objection. The suppression hearing lasted seven days, but only a fraction of that time dealt with the issue that had prompted the prosecution's closure request; most of the suppression hearing addressed other issues. *See Waller*, 467 U.S. at 41-43.

¶34 The United States Supreme Court ruled that the court closure was not warranted because (1) the state's interest in closure was unduly vague; (2) the trial court failed to consider alternatives to the closure; and (3) the closure was excessively long. *Waller*, 467 U.S. at 48-49. Announcing that "the remedy should be appropriate to the violation," the United States Supreme Court refused Waller's request for a new trial to mitigate violation of his constitutional right to a public trial. *Waller*, 467 U.S. at 50. The *Waller* Court reasoned that a properly conducted suppression hearing conducted in open court would, at most, have resulted in the suppression of the evidence; therefore, "a new trial presumably would be a windfall for the defendant, and not in the public interest." *Waller*, 467 U.S. at 50. Consistent with its "remedy . . . appropriate to the violation" standard, the United States Supreme Court ordered only a new suppression hearing, with the instruction to the trial court to decide "what portions, if any, may be closed." *Waller*, 467 U.S. at 50.

¶35 If we apply *Waller*'s case-by-case approach here, Leyerle is not entitled to a new trial because the "windfall" remedy of a new trial is not "appropriate to the violation":[19] The alleged exclusion of the public from a two-minute voir dire of a potentially biased juror, ultimately excused for cause to ensure an unbiased jury for Leyerle, does not require a new trial. What wrong or prejudice did this two-minute hallway voir dire cause for Leyerle or the public that only a new trial can correct? How could a new trial, without this two-minute voir dire of a biased juror out of earshot of the venire, actually produce a fairer trial for Leyerle or a more open trial for the public?

¶36 Unlike in *Waller*, (1) Leyerle did not object to the purported courtroom closure; (2) the need for the alleged closure—bias of a potential juror—was clearly articulated (in contrast to the nebulous concerns the *Waller* trial court cited); (3) there are no facts in the record suggesting that the courtroom itself was ever closed to the public; and (4) the single juror voir dire occurred in a public hallway and was recorded via video camera, a transcription of which is available for public review. *See* I VRP 18-22. If the United States Supreme Court refused to grant Waller a new trial to remedy an actual courtroom closure and exclusion of the public for seven days, only a fraction of which was necessary, how can the majority justify a new trial to "remedy"[20] the two-minute hallway interview to ferret out a biased juror here?

## B. *Presley*

¶37 *Presley* did not explicitly overrule or undermine sub silentio any part of *Waller.* The United States Supreme Court's grant of a new trial for Presley does not necessarily mean that the *Presley* court refused to apply *Waller*'s

[19] *Waller*, 467 U.S. at 50.

[20] *Waller*, 467 U.S. at 50.

"remedy . . . appropriate to the relief standard.[21] On the contrary, *Presley* applied the *Waller* standard but reached a different outcome because the *Presley* facts differed from those in *Waller.*

¶38 Over Presley's objection, the trial court closed the courtroom for the entire voir dire. *Presley*, 130 S. Ct. at 722. Citing concerns about the public "overhear[ing] some inadvertent comment or conversation" and concerns about having enough courtroom seats for the potential jury members, the trial court ordered the only present member of the public, Presley's uncle, to leave the courtroom before voir dire commenced. *Presley*, 130 S. Ct. at 722. The United States Supreme Court reversed and remanded for a new trial, holding that the trial court had violated Presley's Sixth Amendment right to a public trial. *Presley*, 130 S. Ct. at 725. In so doing, the Supreme Court admonished the trial court for failing to "consider alternatives to closure even when they are not offered by the parties" and even offered up some alternatives of its own. *Presley*, 130 S. Ct. at 724-25. The *Presley* Court also noted that the trial court's concern about the "generic risk of jurors overhearing prejudicial remarks" was too tenuous to support the closure of the entire voir dire to the public. *Presley*, 130 S. Ct. at 725.

¶39 Although, unlike in *Waller*, the United States Supreme Court ordered a new trial for Presley, it did not announce that a new trial is automatically required every time a courtroom closure occurs simply because the trial court did not consider alternatives to closure on the record. The *Presley* Court stated, in essence:

> [It is] incumbent upon [the trial court] to consider all reasonable alternatives to closure. [Here, the trial court] did not, and that is all this Court needs to decide.

*Presley*, 130 S. Ct. at 725. This statement about the factual failures in Presley's case, however, neither creates nor equates to a bright-line rule that, *in all future cases*, a new

---

[21] *Waller*, 467 U.S. at 50.

trial is necessary every time a trial court fails to articulate the *Bone-Club* factors on the record.

¶40 The United States Supreme Court held that a new trial was appropriate for Presley because he had objected to the trial court's excluding his uncle from the courtroom for proffered questionable reasons—to allow room for more jurors and to avoid jurors overhearing remarks by Presley's uncle.[22] *Presley*, 130 S. Ct. at 725. But the *Presley* Court did

---

[22] The majority and I offer different explanations for the United States Supreme Court's ordering a new trial in *Presley* and not in *Waller.* The majority asserts that Presley's objection, contrasted with Waller's failure to object, is not a relevant distinction between the two cases because: (1) our Washington Supreme Court has held that a defendant's failure to object to courtroom closure "does not waive the public trial right," majority at 486 n.10; and (2) the United States Supreme Court did not "specifically link its holding, reversing and remanding for a new trial, to an 'objection' prerequisite." Majority at 486 n.10. For purposes of this discussion I will assume that the majority's first point is correct—that under Washington case law a defendant cannot waive the public's right to an open courtroom, whether by simply failing to object to a courtroom closure or otherwise.

I also agree literally with the majority's second point—the Supreme Court did not "specifically link its holding, reversing and remanding for a new trial, to an 'objection' prerequisite." Majority at 486 n.10. But I respectfully disagree with the majority's reasoning behind its second point that, because Washington case law does not differentiate between defendants who object and those who fail to object to courtroom closure, the United States Supreme Court must not have considered this distinction and, therefore, we cannot distinguish *Waller* and *Presley* on this ground. Majority at 486 n.10. And I further disagree that this second point is pivotal to our respective analyses.

We lower courts can readily distinguish higher court opinions on various bases, even when the higher courts' opinions do not include an express disclaimer limiting their holdings to their cases' particular facts. Pertinent here, for example, the Supreme Court cited *verbatim* the colloquy during which Presley's defense counsel expressly objected to the trial judge's courtroom closure. *Presley*, 130 S. Ct. at 722. This specific recitation of Presley's objection and the trial court's rejection of his objection (on grounds that there was " 'no need' " for the public to be present, the public could not " 'intermingle with members of the jury panel,' " and there " 'just [wa]sn't space for [the public] to sit' ") underscores the importance to the Supreme Court of these particular facts in *Presley*, namely Presley's objection to the courtroom closure. *Presley*, 130 S. Ct. at 722 (quoting *Presley v. State*, 285 Ga. 270, 674 S.E.2d 909, 910 (2009)).

Furthermore, the majority's attempts here to synchronize *Waller* and *Presley* lacks Supreme Court support. Without citing language from *Presley* demonstrating any Supreme Court intent to limit *Waller* to the voir dire context, the majority asserts that, although *Presley* does not "overrule" *Waller*, *Presley* instead "explains how *Waller* is to be applied in the voir dire context." Majority at 486 n.10. I agree with the majority that *Presley* decided an "initial question" of "whether the right to a public trial in criminal cases extends to the jury selection phase of trial, and in particular the *voir dire* of prospective jurors." *Presley*, 130 S. Ct. at 723. But I disagree with the majority's attempt to expand *Presley* beyond what the Supreme

not purport to extend its holding to cases lacking comparable justifying facts, such as the case before us, where not only did Leyerle not object to the short hallway voir dire of the single juror, but the record before us shows that the hallway voir dire harmed neither Leyerle nor the public in any way. The utter lack of prejudice here is especially noteworthy in light of the publicly accessible videotape of the interview, which worked to Leyerle's clear advantage when it resulted in excusal for cause of a biased juror whom the trial court had carefully insulated from the remaining potential jurors.

¶41 Furthermore, *Presley* did not explicitly disturb any aspect of *Waller*, including *Waller*'s previously mentioned "remedy . . . appropriate to the violation"[23] standard; on the contrary, *Presley* repeatedly cited *Waller* approvingly. *See, e.g., Presley*, 130 S. Ct. at 724. We should treat *Presley* as having left intact *Waller*'s case-by-case approach to remedies for unjustified courtroom closures. *See Agostini v. Felton*, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (warning other courts to refrain from assuming the United States Supreme Court has implicitly overruled its prior cases).

¶42 Comparing the facts in *Presley* with those here, Leyerle is not entitled to a new trial. The trial court left Leyerle's courtroom open to the public, left the jury venire in the courtroom, and took only the one juror who said he could not be fair into the apparently public hallway outside the courtroom for a two-minute colloquy, during which no member of the public was excluded; furthermore, the colloquy was videotaped and preserved for public review. *See* I VRP 18-22. And unlike Presley, who *objected* to the trial court's courtroom closure during voir dire of *all the jurors*,[24]

---

Court expressly pronounced: Contrary to the majority's assertion, *Presley* held only that the public has no greater right to a public voir dire process under the First Amendment than does the accused under the Sixth Amendment. *See Presley*, 130 S. Ct. at 723-24.

[23] *Waller*, 467 U.S. at 50.

[24] *Presley*, 130 S. Ct. at 722.

Leyerle assented to the hallway interview of this one juror.[25] Based on these significantly different facts, *Presley* does not require automatic reversal and a new trial for Leyerle.

## C. *Paumier*

¶43 A different panel of our court decided *Paumier* earlier this year.[26] The majority here relies on the *Paumier* majority's reading of *Presley* as requiring the automatic grant of a new trial whenever a trial court fails to articulate the *Bone-Club* factors on the record before closing the courtroom or excluding a member of the public from any portion of the trial proceedings. *See* majority at 478 (citing *Paumier*, 155 Wn. App. 673). I disagree with the *Paumier* majority's effectively reading *Presley* as overruling *Waller*'s requirement that the remedy be appropriate to the violation and that the reviewing court analyze the circumstances of the closure before requiring remand. *See Paumier*, 155 Wn. App. at 685. In my view, Judge Quinn-Brintnall accurately distinguishes *Presley* in her *Paumier* dissent on the grounds that, unlike Paumier, who did not object, Presley had expressly objected to the exclusion of his uncle from the courtroom during voir dire. 155 Wn. App. at 688 (Quinn-Brintnall, J., dissenting). Although lacking in precedential value, I adopt Judge Quinn-Brintnall's dis-

---

[25] Concerned about the *Bone-Club* factors in relation to the hallway juror voir dire, the State asked the trial court to clarify on the record that no spectators were present and Leyerle had waived his right to be present. *See* I VRP at 19. The trial court responded, "[T]here were no spectators who waived their right to be here so in this [case] it is easy so long as Mr. Leyerle doesn't want to be here and his counsel said [he] didn't want to be here. Isn't that correct?" Leyerle's counsel responded, "Yes, Your Honor." I VRP at 20.

The majority characterizes this part of the record as "silent" as to "whether counsel so advised the defendant or whether Leyerle was otherwise advised of his right to be present." Majority at 482 n.8. With all due respect, the majority is incorrect: Leyerle's counsel clearly stated that Leyerle "[did]n't want to be" in the hallway and that Leyerle's counsel "d[id]n't want jurors anywhere near [his] client." I VRP at 20.

[26] Judge Bridgewater wrote the majority opinion in *Paumier*, in which Judge Houghton concurred. Judge Quinn-Brintnall filed a dissenting opinion.

senting rationale in *Paumier* and incorporate it into my dissent here for similar reasons.

¶44 In my view, the following statement of two of my learned colleagues in the *Paumier* majority improvidently inflates the United States Supreme Court's holding in *Presley*: "Thus, where the trial court fails to sua sponte consider reasonable alternatives and fails to make the appropriate findings, the proper remedy is reversal of the defendant's conviction." *Paumier*, 155 Wn. App. at 685 (citing *Presley*, 130 S. Ct. at 725). With all due respect, my reading of *Presley* does not support such inflation. If *Presley* created a bright-line rule, then *Waller*'s "remedy . . . appropriate to the violation"[27] standard would necessarily have to be overruled. Yet *Paumier* (and the majority here) did not explain how *Presley* explicitly overruled or implicitly undermined *Waller*, a case which *Presley* repeatedly cited with approval. In fact, the United States Supreme Court

> [has] not acknowledge[d or held] that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. [Rather,] "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Agostini*, 521 U.S. at 237 (fourth alternation in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989)).

¶45 In addition, *Paumier* is distinguishable from Leyerle's case. First, the *Paumier* trial court allowed voir dire of several potential jurors in the judge's chambers, an area apparently not open to the public.[28] Here, in contrast,

---

[27] *Waller*, 467 U.S. at 50.

[28] In *Paumier*:

The trial court stated at the outset that potential jurors who preferred to answer questions privately to avoid possible embarrassment would be taken into the judge's chambers. Several jurors indicated during the course of voir

the trial court did not voir dire the one juror in a private area such as the judge's chambers or some other area apparently closed off to the public; rather, it conducted the short voir dire in the apparently public hallway outside the courtroom. In addition, the trial court here videotaped the two-minute interview, making the individual juror voir dire part of the public record. *See* I VRP at 19.

¶46 Furthermore, it is important to note that the two-judge *Paumier* majority reversed and remanded for a new trial based, not only on the courtroom closure, but also on the trial court's abuse of discretion in denying Paumier's request to represent himself. *Paumier*, 155 Wn. App at 686-88. Such is not the case here.

## D. *Momah*[29] and *Strode*[30]

¶47 As the *Paumier* majority acknowledges, in *Momah* the Washington Supreme Court explained that a "structural" error requires automatic reversal and a new trial. *Paumier*, 155 Wn. App. at 681 (citing *Momah*, 167 Wn.2d at 149). An error is structural in nature when "it 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *Momah*, 167 Wn.2d at 149 (alternation in original) (internal quotation marks omitted) (quoting *Washington v. Recuenco*, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)). Again, such is not the case here.

¶48 The issue in *Momah* was whether a closed voir dire session constituted a structural error. *Momah*, 167 Wn.2d at 151-52. The *Momah* court held that it was not. *Momah*, 167 Wn.2d at 152. Momah "affirmatively assented to the closure, argued for its expansion, had the opportunity to

dire that they preferred to answer certain questions in chambers. The judge and the parties questioned five jurors in chambers, recording the jurors' responses. Jury selection was completed that same day.

*Paumier*, 155 Wn. App. at 676 (footnote omitted).

[29] *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009), *cert. denied*, 131 S. Ct. 160 (2010).

[30] *State v. Strode*, 167 Wn.2d 222, 217 P.3d 310 (2009).

object but did not, actively participated in it, and benefited from it." *Momah*, 167 Wn.2d at 151. Additionally,

> and perhaps most importantly, the trial judge closed the courtroom *to safeguard Momah's constitutional right to a fair trial by an impartial jury*, not to protect any other interests.

*Momah*, 167 Wn.2d at 151-52 (emphasis added). For these reasons, the Supreme Court held that the closed voir dire session was not structural error in *Momah*. 167 Wn.2d at 151-52.

¶49 Here, as in *Momah*, there are no facts suggesting that the hallway juror interview "render[ed] [Leyerle's] criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Momah*, 167 Wn.2d at 149. On the contrary, because the trial court excused this juror for cause following voir dire, at Leyerle's request,[31] the hallway interview protected and enhanced the fundamental fairness of Leyerle's trial, just as the voir dire protected Momah from jurors with prejudice against him. *Momah*, 167 Wn.2d at 151-52.

¶50 The *Paumier* majority also cited *"Strode*, a plurality decision released the same day as *Momah*," to support the following observation, which ironically appears to accept *Waller*'s case-by-case approach rather than a bright-line rule of automatic reversal:

> [D]*espite Momah*, it appears that six justices agree that a *Bone-Club* analysis (or some equivalent) is required prior to closing the courtroom. *What was not clear* after *Momah* and *Strode* is what *the appropriate remedy* should be when *Bone-Club* guidelines are not employed prior to closure. *Apparently*, the reviewing court is to look to the record to see if the trial court employed some equivalent of *Bone-Club* and then *fashion a remedy appropriate to the violation if the trial court failed to engage in an adequate inquiry.*

*Paumier*, 155 Wn. App. at 683 (emphasis added).

¶51 I strongly agree with the majority in *Paumier*, as our Washington Supreme Court noted in *Momah*, that it is a

---

[31] I VRP at 21.

"better practice" for the trial court to articulate on the record its consideration of each *Bone-Club* factor and its reason for closing the courtroom. *Paumier*, 155 Wn. App. at 680 (citing *Momah*, 167 Wn.2d at 152 n.2). Nevertheless, an automatic reversal of Leyerle's conviction is not warranted simply because the trial court's partial articulation of its reasons here fell short of formulating all of the *Bone-Club* factors. Nor does the case law so require. It is undisputed that the short voir dire of the biased juror in the hallway advanced and protected Leyerle's right to trial by an impartial jury, especially when it resulted in preventing that biased juror from tainting the rest of the venire with the following exchange:

> [BIASED JUROR]: To be very candid with you. I am prejudicial towards the officers involved. I've spent too much time on the other side—I'm already biased for the other side and I can't help it. I've just spent too much time in that environment.
>
> JUDGE STONIER: And you feel that this would—it would be difficult to be fair in this case, is that correct?
>
> [BIASED JUROR]: Well, let's put it this way, I wouldn't take the evidence—I wouldn't take the evidence evenly on both sides. I would be prejudicial towards the law enforcement side.
>
> JUDGE STONIER: So you would tend to believe them if they testified?
>
> [BIASED JUROR]: I mean, I tend to believe it already and I haven't even heard the testimony. And I'm sorry about that, Judge. I mean I didn't want to . . . I didn't want to contaminate your jury pool.

I VRP (Nov. 16, 2007) at 19-20. Because of these statements, the trial court granted Leyerle's request to excuse this biased juror for cause. *See* I VRP (Nov. 16, 2007) at 21. Thus, the only effect of the hallway interview was to preserve Leyerle's fundamental right to trial by an impartial jury, a right that the Sixth Amendment protects in addition to the right to a public trial. *See Brightman*, 155 Wn.2d at 514; *Momah*, 167 Wn.2d at 152.

¶52 I would hold that the trial court here properly exercised its discretion to protect both constitutional rights,

properly making paramount Leyerle's fundamental right to a fair trial by an impartial jury. Questioning one biased juror for two minutes in the hallway, with Leyerle's assent, violated no constitutional right, while it protected the most basic of his constitutional rights. That in so doing the trial court did not articulate on the record all of the *Bone-Club* factors neither requires nor merits reversal and new trial. I strongly, but respectfully, disagree with the majority's reversal of Leyerle's conviction based on a technicality that advanced, rather than thwarted, justice. Again, I would affirm.