

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Matter of the Vulnerable Adult Petition for: | ) ) ) | No. 37496-3-III |
| ALAN CARLIN, | ) ) | |
| PETER CARLIN, | ) ) | UNPUBLISHED OPINION |
| Respondent, | ) ) | |
| v. | ) ) | |
| MARY C. EZENWA, | ) ) | |
| Appellant. | ) | |

FEARING, J. — Mary Ezenwa appeals from the superior court's entry of an order restraining her from contact with eighty-two-year-old Alan Carlin. The trial court found Ezenwa to have isolated and abused Carlin in violation of the Vulnerable Adult Protection Act. Overwhelming evidence and the law support the trial court's ruling. We therefore affirm.

FACTS

Never advertise oneself as a millionaire.

Alan Carlin, born April 28, 1937, resided in Fairfax, Virginia. His wife died in 2018. Alan has three adult children: Nancy Bundics, Danielle Roselin, and Peter Carlin. Although Alan lives independently, he receives food, cleaning, and yard care assistance.

On the evening of December 24, 2019, Alan Carlin connected with Mary Ezenwa, born July 22, 1984, after she sent him a message through the dating website millionairematch.com, the leading millionaire dating service, serving only developed countries since 2001. Alan responded with information regarding his education, work, and family. E-mail messages show that Ezenwa and Alan's relationship developed instantaneously. In her second e-mail on December 24, Ezenwa expressed her love for Alan. She also conveyed a conviction that the couple would successfully bear a family. Alan replied with an offer for Ezenwa to visit him. Ezenwa responded with her own invitation for Alan to travel to Spokane and live with her at her apartment for eight months, after which they could consider marriage and children.

On Christmas day, 2019, Alan Carlin informed Mary Ezenwa that his physician advised him not to fly. Alan invited Ezenwa to travel to Fairfax because of his commodious home and convenient transportation facilities in adjacent Washington, D.C. He volunteered to purchase meals for them. Ezenwa accepted the invitation and, that same day, informed Alan of her intended arrival date of January 3. She, however, ultimately obtained a ticket for January 18.

Between Christmas and January 18, Alan Carlin and Mary Ezenwa focused e-mail communications on Alan's work and Ezenwa's desire to assist him for free on grant-funded projects. Ezenwa offered to split revenue accrued from the grants. She inquired of Alan as to his experience with obtaining grant funding. On December 26, Ezenwa sent two lists of potential projects for which the duo could seek grants.

On January 18, 2020, Mary Ezenwa, at her own expense, flew from Spokane to Virginia to meet Alan Carlin. She there resided at Alan's home. Alan's children knew of a female visiting Alan, but could not discover her name. On January 24, 2020, Alan and Mary Ezenwa joined in matrimony.

On January 24, Alan Carlin's son, Peter, filed a petition, in Fairfax County, Virginia Circuit Court, seeking appointment as guardian and conservator for Alan. Peter alleged in the petition that his father faced financial and physical risk as a result of his permitting a stranger to live with him. Peter highlighted the stranger's refusal to identify herself. In the petition, Peter outlined his father's finances:

> Alan Carlin's estate includes his residence . . . which has an assessed value of $783,830; and bank and brokerage accounts with a total value of approximately $1.5 million. Alan Carlin has income from his Federal government retirement annuity and investment income of approximately $150,000 annually.

Clerk's Papers (CP) at 32. Peter Carlin declared in his petition that his father suffered from cerebral amyloid angiopathy, a disorder that leads to damage in blood cells and subsequent progressive strokes.

3

With his petition for guardianship, Peter Carlin filed a letter from Argye E. Hillis, Alan Carlin's treating neurologist. Dr. Hillis confirmed that Alan suffered from cerebral amyloid angiopathy. Cognitive testing, in September 2019, showed that Alan suffered from "significant deficits in areas of the brain responsible for frontal lobe functioning." CP at 37. Hillis opined that the brain damage impacts Alan's decision making capacity and poses a risk for personal and financial exploitation by others.

On January 24, 2020, Peter Carlin served the petition for appointment of guardianship on Alan. Peter also served notice of a hearing for January 31, 2020, which hearing would determine the necessity of the appointment for a guardian. The notice informed Alan that appointment of a guardian may impact the spending of his money, the management of his property, and the rendering of medical decisions.

On January 27, the newlyweds, octogenarian Alan Carlin and tricenarian Mary Ezenwa, flew to Spokane. Alan purchased the airline tickets. Alan sent a message to his three children that informed them of his marriage and his plans to visit his new wife's home. An acquaintance of Ezenwa's, Sara Miller, retrieved the couple from the Spokane airport and drove them to her apartment in Cheney.

On January 29, Alan Carlin's daughter, Danielle Roselin, contacted Officer Rocky Hanni of the Cheney Police Department and expressed concern for her father. Roselin believed, based on tower pings from Alan's cellphone, her father to be present in Cheney. Officer Hanni contacted Fairfax County law enforcement authorities, who informed

4

Hanni that they did not consider Alan a missing person since he was an adult without any history of incompetency. Officer Hanni decided to perform a welfare check anyway.

On January 30, Officer Rocky Hanni traveled to 515 West 6th Street, Cheney, the apartment of Sara Miller. He encountered a nervous and shaking Mary Ezenwa. Ezenwa exited the residence to speak with Officer Hanni. Ezenwa informed Hanni that she rented a room with her husband, Alan. Ezenwa disclosed her last name. Officer Hanni asked Ezenwa how she spelled her last name. Ezenwa looked at a document in her hand before responding. Hanni asked Ezenwa to spell her middle name, and she again peered at the document. Hanni told Ezenwa that he failed to write down the middle name, and he asked her to repeat the spelling. Ezenwa viewed the document in her hand a third time. Finally, Hanni asked Ezenwa to pronounce her middle name. Ezenwa answered that she never learned how to pronounce the name.

Officer Rocky Hanni requested of Mary Ezenwa that she grant him the opportunity to speak with Alan Carlin. Ezenwa replied that Alan just finished showering and would need time to prepare to see others. Ezenwa reentered the apartment.

Five minutes later Officer Rocky Hanni knocked again on the apartment door. Mary Ezenwa appeared outside again and informed Hanni that Alan needed an additional thirty minutes to place hearing aids in his ears. A patient Officer Hanni returned to the address in thirty minutes and spoke with Alan. Alan informed Hanni that his children were attempting to declare him incompetent in order to prevent him from disinheriting

them. Alan protested that he purchased a plane ticket, boarded the plane, and journeyed to Spokane of his own free will.

After his conversation with Alan Carlin on January 30, Officer Rocky Hanni contacted Adult Protective Services to alert the agency to the situation of Alan. Then on January 31, Officer Rocky Hanni contacted Sara Miller, the principal occupant of 515 West 6th Street, Cheney. Miller told Officer Hanni that she met Mary Ezenwa two years earlier. Ezenwa, however, had never stayed with her before arriving in Spokane with Alan Carlin. Miller explained that Ezenwa informed her that she lived with Alan in Virginia for two years and that the two recently married. Miller first believed that the wedded pair planned on staying at her residence for two nights, but then Ezenwa asked to stay for multiple weeks. Miller told Ezenwa that she and Alan could stay until February 12, when another resident would move into their room. Miller also told Officer Hanni that Ezenwa told her that she and Alan came to the state of Washington for a psychiatric evaluation, but Miller did not know the reason for the evaluation.

During the afternoon of January 31, 2020, Cheney Police Department Officers Timothy Ewen, Chris English, and Zebulon Campbell visited the residence at 515 West 6th Street. Mary Ezenwa answered their knock on the door, and she invited the three officers inside. The officers served documents on Ezenwa and Alan Carlin. The documents included a temporary order of protection obtained by Peter Carlin in Spokane

County Superior Court, which order declared Alan a vulnerable person. The officers afforded Ezenwa the opportunity to collect her belongings and depart the residence.

While still at the residence, Officer Zebulon Campbell concluded that, because a court had determined Alan Carlin to be a vulnerable adult and because Alan could not articulate any plans to care for himself, Alan should be placed in protective custody. Law enforcement transported Alan involuntarily to Sacred Heart Medical Center in Spokane.

Daughter Danielle Roselin traveled to Spokane and visited Alan at the hospital. According to Roselin, on Alan's admission to the hospital, hospital staff found him to be dehydrated, anemic, and agitated. Alan also suffered from reduced kidney function, a urinary tract infection, and an elevated lactic acid level, the latter condition which can occur during a worsening infection and places the patient at risk of sepsis. Alan told his daughter that he had fallen during his stay in Cheney. The fall resulted from a low airbed on which he slept or from a room that lacked light and was sprinkled with trash that created obstacles to walking.

On February 4, 2020, Officer Rocky Hanni visited Alan Carlin in the hospital. Alan informed Officer Hanni that, before leaving Virginia, Mary Ezenwa requested that Alan go to the post office and change his mailing address to 210 E. Lincoln Road, Apartment 156, Spokane. When he returned from the post office, Ezenwa informed him that his new address should instead be Apartment 157. This change of address concerned Alan because he did not know who resided there. Alan further explained to Hanni that,

7

on arriving in Cheney, he opened a bank account, in which he deposited $6,000.01. He believed Ezenwa possessed paperwork for the account. Alan did not know whether Ezenwa could withdraw money from the account. Alan informed Officer Hanni that Ezenwa claimed to be a patient advocate, who owned two tech firms. Ezenwa boasted of a net worth $5 million.

PROCEDURE

As previously written, on January 31, 2020, Peter Carlin filed a petition for a vulnerable adult protection order on behalf of his father, Alan. Peter alleged in his petition that he was an interested person concerned about the welfare of his father. Peter declared a good faith belief that his father needed protection. Peter, as he did in the petition in Virginia, explained that Carlin suffers from cerebral amyloid angiopathy. Peter alleged that Alan's illness interfered in his ability to render rational decisions and placed him at risk for abuse and personal and financial exploitation by others. Peter added that Alan had been subject to online scams in the recent past as a result of his profile on millionairematch.com. Alan's treating neurologist, Argye Hillis, and his primary care physician, Ellen Jenkins, submitted declarations in support of the petition. The two physicians averred that Alan recently was the target of financial scams.

In an exhibit to the petition, Peter Carlin outlined recent events in his father's life. According to the outline, on September 11, 2019, Alan Carlin executed a limited durable power of attorney naming his daughter Nancy Bundics as attorney-in-fact. The document

authorized Nancy to assist in the handling of her father's finances. Alan executed the power of attorney shortly after he lost $30,000 to scammers. He had earlier sent $110,000 to other scammers. These transactions depleted his checking and primary savings accounts. At the time he signed the durable power of attorney, he used funds in his retirement account for everyday expenses.

On January 31, Peter Carlin obtained a temporary order for protection that declared his father to be a vulnerable adult. The notice and temporary protection order gave notice of a hearing on February 13, 2020.

On February 13, 2020, the Spokane County Superior Court commissioner entertained Peter Carlin's request for a final order of protection. Alan Carlin did not attend the hearing, but submitted a declaration in support of the petition. In the declaration, he agreed to the restrictions against Mary Ezenwa planted in the preliminary protection order and asked the court to make the restrictions permanent.

On February 13, the court commissioner continued the hearing to February 27, 2020. The commissioner extended the temporary protection order in the interim. Thereafter Alan Carlin filed another declaration and Mary Ezenwa filed two declarations.

Alan Carlin's second declaration outlined his experience with Mary Ezenwa. Alan asserted that, before he left Virginia, a social services specialist from Adult Protective Services of Fairfax County visited his home in Virginia at the request of one of his children. Since no one was then present at the abode, the social worker left his card.

9

Ezenwa informed Alan that Virginia APS was a regulatory agency that would severely restrict his freedom. She warned Alan that, if the agency found him, it would take him into custody. According to Alan, Ezenwa told him that, if married, Virginia authorities could not assume custody of him. She also suggested that the couple travel to Washington State where, according to Ezenwa, a higher threshold existed for granting a guardianship. Ezenwa informed Alan that, once married, she could become his guardian, which would prevent Peter Carlin from obtaining the position. Ezenwa also told Alan that she possessed a $5 million net worth. Alan later learned that she lacked money for an attorney for the current proceeding and that she sought money from his friends to obtain the attorney's $3,500 retainer.

In Mary Ezenwa's first declaration, she denied telling Alan that, if he married her, Virginia's adult protective services could not restrict his behavior. She could not recall telling Alan that she wanted to be his guardian, however, she possibly told him that the courts appoint wives as guardians for their husbands. Finally, Ezenwa denied disclosing a net worth of $5 million.

In her second declaration, Mary Ezenwa acknowledged that she found Alan Carlin on a website for women seeking wealthy men. She explained that she was asexual and encountered difficulty in gaining a male companion who did not expect sexual relations. She did not explain why wealthy men were less likely to desire sexual contact than poor men. In the declaration, Ezenwa asserted that she did not pursue Alan, rather he pursued

10

her as shown by email.  She maintained that the two shared interests in common and she never sought to control his money.  She declared that she had subpoenaed Spokane physician Debra Brown, who evaluated Alan and found him competent.

On February 27, 2020, the superior court commissioner conducted a hearing on the petition for a vulnerable adult protection order.  During the hearing, Peter Carlin's counsel notified the court commissioner that counsel subpoenaed three witnesses, including Mary Ezenwa, and these witnesses were present in the courtroom if the court desired testimony beyond the declarations.  Mary Ezenwa's counsel contended that he received late notice of the witnesses, and he argued that the witnesses could have all submitted affidavits.  The court commissioner commented that courts generally resolved proceedings involving vulnerable adults by affidavits, and, after counsel's presentations, she would decide if she required additional information.  Ezenwa presented no lay witnesses, expert testimony, or third-party affidavits to support her position.  She did not ask for live testimony.  After argument by counsel, the court commissioner decided the petition based on the declarations.

In an oral ruling, the court commissioner observed that Alan Carlin supported the petition.  She noted that two medical professionals submitted declarations in support of the petition.  Dr. Argye Hillis opined that Alan could be at risk for personal and financial exploitation due to damage of his frontal lobe.  Alan's daughter Danielle Roselin, a

11

psychologist, averred that Alan lacked insight into how his behavior led to the present situation. Roselin described Alan's poor condition when transported to the hospital.

The court commissioner rejected Mary Ezenwa's contention that she had not exploited Alan Carlin. The commissioner commented on the telling communications between Alan and Ezenwa.

> [S]he [Mary Ezenwa] states she loves him. The next day they talk about her traveling to DC to stay with him in his home that has four bedrooms close to DC. He will buy her food. She provides him of a very detailed list of what she needs at Costco for her nutrition supplements. This court finds that to be laying that foundation as far as how far will Mr. Carlin go? She also talks about wanting to be his silent partner to write the books, that she can do a lot of things for him. "One, build a fancy website for you. One book per month. One newsletter weekly. Two blog posts weekly. Marketing by social media platforms. Weekly webmaster role for the email, et cetera. Love Mary." And again, this is the first day they're talking.

Report of Proceedings (RP) at 27.

During the court commissioner's oral ruing, she observed that, less than 24 hours after meeting Alan Carlin on the Internet, Ezenwa broached the possibility of children, although she later professed to be asexual. The court commissioner highlighted that Alan informed Ezenwa that he could not travel, yet the pair flew to Spokane. Alan's family located the couple only as the result of pings on cell phone towers. The commissioner, after referencing e-mail and texts between Alan and Ezenwa, remarked:

> This is isolation. This is removing him from the home of 50 years. Removing him from family. This is exploitation, emotionally, financially, even after the service of this order for protection she's asked for money.

12

Washington State Law clearly says if you're a married couple that the wife/husband will have 50 percent.

RP at 29-30.

The court commissioner found Alan Carlin to be a vulnerable adult. The court also found Mary Ezenwa to pose a threat to the physical safety of Alan. The commissioner granted the vulnerable adult protection order.

LAW AND ANALYSIS

On appeal, Mary Ezenwa assigns six errors to the trial court proceedings. First, law enforcement conducted an unlawful search and seizure of her temporary Cheney residence in violation of the Fourth Amendment of the United States. Second, petitioner Peter Carlin failed to serve the petition for a vulnerable adult protection proceeding and notice of hearing on Alan Carlin. Third, the superior court denied Ezenwa a fair hearing and due process. Fourth, Peter Carlin was not an "interested person" within the meaning of the vulnerable adult protection act. Fifth, insufficient evidence supported the superior court's finding that Alan Carlin was a vulnerable adult. Sixth, insufficient evidence supported the superior court's finding that Alan Carlin was the victim of isolation, emotional abuse, and personal and financial exploitation under RCW 74.34. We address the assignments of error in such order. Ezenwa's numerous assignments of error and her contention that substantial evidence did not support the court commissioner's ruling prolongs our opinion.

Law Enforcement Entry

Mary Ezenwa contends that law enforcement entered and remained in her residence in violation of the United States Constitution's Fourth Amendment. We assume Ezenwa references the entry on January 31, 2020, by Cheney Police Officers Timothy Ewen, Chris English, and Zebulon E. Campbell. The facts show that Officer Rocky Hanni did not enter the home on January 30.

Mary Ezenwa does not inform the court what relief she deems she should receive as a result of an alleged unlawful entry. We question, but do not decide, whether the court may exclude, during a vulnerable adult protection proceeding, evidence based on an unlawful entry into a home. We also assume, but do not decide, that the officers could enter the home under their community caretaking function. *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973); *State v. O'Neill*, 148 Wn.2d 564, 574, 62 P.3d 489 (2003); *State v. Mennegar*, 114 Wn.2d 304, 309, 787 P.2d 1347 (1990).

We reject Mary Ezenwa's Fourth Amendment to the United States Constitution assignment of error based on consent. The evidence shows that Ezenwa invited the three officers inside her premises on January 31. She never revoked the consent, and the officers never exceeded any consent. The officers did not engage in any search or seizure of property. One exception to the Fourth Amendment warrant requirement is consent. *State v. Walker*, 136 Wn.2d 678, 682, 965 P.2d 1079 (1998).

Service of Process

Mary Ezenwa assigns error to Peter Carlin's alleged failure to serve the petition for vulnerable adult protection order and the notice of hearing on his father, Alan Carlin. In her brief, she cites RCW 74.34.120(3) for the rule that the pleadings must be served on the vulnerable adult. She also cites RCW 74.34.115 for the rule that the petitioner must furnish a written notice to the vulnerable adult using the standard notice form described in the statute. But then Ezenwa provides no argument that Peter Carlin failed to follow either statute. The facts show that Alan Carlin received proper notice. During the hearing before the court commissioner, Ezenwa never argued to the contrary.

Fair Hearing and Due Process

Mary Ezenwa contends the trial court denied her due process by refusing Ezenwa the opportunity to call witnesses and by allowing Peter Carlin to introduce as evidence old medical records. We deny the factual underpinning to Ezenwa's arguments and so reject her assignment of error.

The due process clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Matthew v. Eldridge*, 427 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

15

Under the vulnerable adult protection act, Chapter 74.34 RCW, due process protections include, among other safeguards, the requirement that one file a petition along with an affidavit setting forth the facts and circumstances supporting it, a hearing before a judicial officer, notice to the respondent at least six days before the hearing, an opportunity to appeal, and a five-year limitation on the protection order. RCW 74.34.110(1)-(3), .120(2)(3), .130(7). In addition, pursuant to RCW 74.34.135(3):

> At the hearing scheduled by the court, the court shall give the vulnerable adult, the respondent, the petitioner, and in the court's discretion other interested persons, the opportunity to testify and submit relevant evidence.

Mary Ezenwa correctly asserts that no witnesses testified at the February 27 hearing. Nevertheless, Ezenwa and Peter Carlin agreed that the court commissioner could decide the petition based on the declarations filed. In her declaration, Mary Ezenwa averred that she attempted to subpoena Dr. Debra Brown to testify. Nevertheless, in her declaration and during the hearing, she never explained her inability to subpoena the physician. She did not ask for a continuance in order to serve the subpoena. The court commissioner never declined a request by Mary Ezenwa to call live witnesses. Assuming a decision based solely on declarations violated due process principles, her direction to the court commissioner to base her decision on the declarations constitutes invited error.

16

The invited error doctrine prohibits appellate review of an error that the party creates before the trial court. *State v. Momah*, 167 Wn.2d 140, 153, 217 P.3d 321 (2009). The doctrine prevents parties from misleading trial courts and receiving a windfall by doing so. *State v. Momah*, 167 Wn.2d at 153.

Mary Ezenwa next contends that more recent medical reports from two medical professionals in Spokane show that Alan Carlin is competent and not in danger of financial exploitation. Peter Carlin replies, in part, that Ezenwa references medical reports not presented to the trial court and that this court does not generally review evidence presented for the first time on appeal.

RAP 9.11(a) provides:

> The appellate court may direct that additional evidence on the merits of the case be taken before the decision of a case on review if: (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

All six factors must be met in order to permit supplementation of the record. *Schreiner v. City of Spokane*, 74 Wn. App. 617, 620-21, 874 P.2d 883 (1994). Mary Ezenwa does not ask this court to entertain additional evidence under RAP 9.11. Nor does she provide any analysis as to the application of the rule's factors. Therefore, we deny her contention.

This court will not entertain an assignment of error not supported by argument and citation to legal authority. *BC Tire Corp. v. GTE Directories Corp.*, 46 Wn. App. 351, 355, 730 P.2d 726 (1986).

Mary Ezenwa contends that the declarations of neurologist Argye E. Hillis and primary care physician Ellen Jenkins were false, were known by Peter to be false, and contained outdated opinions. Nevertheless, the trial court, not this reviewing court, determines what evidence is false. An appeals court does not reweigh the evidence or determine credibility. *Young v. Toyota Motor Sales U.S.A.*, 9 Wn. App. 2d 26, 39, 442 P.3d 5 (2019), *aff'd*, 196 Wn.2d 310, 472 P.3d 990 (2020). Ezenwa provides no analysis as to when the medical opinions purportedly become outdated. Because of Alan Carlin's age, the validity of medical opinions concerning his inability to care for his wellbeing and his susceptibility to manipulation would increase as time passed after the signing of the declarations by the two physicians.

Interested Person

Mary Ezenwa contends that Peter Carlin is not an interested person under the vulnerable adult protection act. We disagree.

The vulnerable adult protection act defines an "interested person" as one:

> who demonstrates to the court's satisfaction that the person is interested in the welfare of the vulnerable adult, that the person has a good faith belief that the court's intervention is necessary, and that the vulnerable adult is unable, due to incapacity, undue influence, or duress at the time the petition is filed to protect his own interests.

18

RCW 74.34.020(12).

In his petition for a vulnerable adult protection order, Peter Carlin affirmed that he worried about the welfare of his father. Peter also declared that he had a good faith belief that his father needed protection. According to Peter, his father suffered from from cerebral amyloid angiopathy. The impairment affected his ability to manage his own personal affairs, finances, and health needs. Alan Carlin, during a one year window of time, had wired $110,000 to random individuals. Few, if any persons, held more interest in the welfare of Alan, then Alan's son, Peter.

## Vulnerable Adult

Mary Ezenwa contends that Peter Carlin's petition did not sufficiently allege the status of Alan Carlin as a vulnerable adult and that the declarations in support of the petition did not supply sufficient evidence for the court commissioner's finding of Alan being a vulnerable adult. As to her first contention, Ezenwa did not argue, before the court commissioner, of an insufficiency of the petition. Reviewing courts normally will not review an issue for the first time on appeal. RAP 2.5(a). Ezenwa also does not provide any argument that this court should review the insufficiency of a petition when the court commissioner found, after a hearing, the facts to support the petition. Thus, we move to the question of whether substantial evidence supports the court commissioner's finding of Alan Carlin being a vulnerable adult.

The legislature enacted the Abuse of Vulnerable Adults Act in order to protect adults who "may be subjected to abuse, neglect, financial exploitation, or abandonment." *See* RCW 74.34.005(1). In its legislative findings, the legislature declared that a vulnerable adult may be subject to such abuse or exploitation "by a family member, care provider, or other person who has a relationship with the vulnerable adult." RCW 74.34.005(1). The legislature recognized that "[a] vulnerable adult may have health problems that place him or her in a dependent position." RCW 74.34.005(4).

To protect vulnerable adults, the legislature permits an interested person to submit a petition for an order for protection of a vulnerable adult. RCW 74.34.110(1) impliedly defines a "vulnerable adult" as one facing abandonment, abuse, financial exploitation, neglect, of the threat of any of the four phenomenon. The statute reads:

> A vulnerable adult, or interested person on behalf of the vulnerable adult, may seek relief from abandonment, abuse, financial exploitation, or neglect, or the threat thereof, by filing a petition for an order for protection in superior court.

RCW 74.34.110(1). Elsewhere the vulnerable adult protection act defines a "vulnerable adult" as:

> Sixty years of age or older who has the functional, mental, or physical inability to care for himself or herself.

RCW 74.34.020(22)(a).

Overwhelming evidence supported the trial court's finding that Alan Carlin had the functional, mental, or physical inability to care for himself. Alan was 82 years old.

20

According to Dr. Ellen Jenkins, Alan's primary care physician, Alan suffers from cerebral amyloid angiopathy. The disease causes deficits in the brain's frontal lobe and leads to impaired functioning. Jenkins opined that Alan requires supervision and remained at risk for financial scams. The record showed Alan already lost tens of thousands of dollars to scammers. Jenkins declared support for the vulnerable adult petition.

Neurologist Argye Hillis also declared that Alan suffers from cerebral amyloid angiopathy. She opined that the condition causes miniature strokes, resulting from damage to the blood vessels. She stated that the resulting impairment impacts his decision making capacity, judgment, reasoning and insight. His impairment placed him at risk for personal and financial exploitation and abuse of others.

The declaration of Danielle Roselin described Alan Carlin's condition at the time he arrived at the Spokane hospital. As a result of the care, or lack thereof, from Mary Ezenwa, Alan Carlin suffered from dehydration, anemia, and at risk for sepsis. Alan had fallen while with Mary Ezenwa. He slept on a low airbed in a room cluttered with trash. According to psychologist Roselin, her father lacked insight into how his behavior had placed him in a dangerous situation.

This court reviews the superior court's decision to enter a permanent order of protection for an abuse of discretion. *Hecker v. Cortinas*, 110 Wn. App. 865, 869, 43 P.3d 50 (2002). The superior court abuses its discretion in entering the order if it is

21

"manifestly unreasonable or exercised on untenable grounds or for untenable reasons."

*In re Matter of Knight*, 178 Wn. App. 929, 936, 317 P.3d 1068 (2014).  This court

reviews the superior court's findings to determine if they are supported by substantial

evidence.  *In re Matter of Knight*, 178 Wn. App. at 936.  This court does not reevaluate

"the persuasiveness of the evidence, witness credibility, and conflicting testimony,"

leaving such determinations solely to the trier of fact.  *In re Matter of Knight*, 178 Wn.

App. at 936.

### Victimhood

Mary Ezenwa next contends that the superior court commissioner failed to make

specific findings to support her determination that Ezenwa committed actions amounting

to financial exploitation.  According to Ezenwa, the court commissioner needed to and

failed to enter a specific finding that Ezenwa acted with deception, intimidation, or

unlawful influence to gain control over Alan Carlin's resources.  She also argues that the

evidence did not support any conclusion that she harmed Alan.  Ezenwa further contends

that the court commissioner failed to make findings that Ezenwa's actions amounted to

neglect, but we ignore this contention because of alternate grounds on which to affirm the

superior court.

RCW 74.34.110(1) declares:

> A vulnerable adult, or interested person on behalf of the vulnerable
> adult, may seek relief from *abandonment, abuse, financial exploitation, or*

> *neglect, or the threat thereof*, by filing a petition for an order for protection in superior court.

(Emphasis added.) We note that the petitioner need not prove financial exploitation, abuse, and neglect, only one of the conditions. Any of the conduct by the respondent suffices for entry of a protection order. We also observe that the petitioner need not show actual abuse or financial exploitation, as long as the petitioner shows a threat of either.

RCW 74.34.020(2) defines some of the operative terms found in RCW 74.34.110(1):

> (1) "Abandonment" means action or inaction by a person or entity with a duty of care for a vulnerable adult that leaves the vulnerable person without the means or ability to obtain necessary food, clothing, shelter, or health care.
> (2) "Abuse" means the willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult. In instances of abuse of a vulnerable adult who is unable to express or demonstrate physical harm, pain, or mental anguish, the abuse is presumed to cause physical harm, pain, or mental anguish. Abuse includes sexual abuse, mental abuse, physical abuse, and personal exploitation of a vulnerable adult, and improper use of restraint against a vulnerable adult which have the following meanings:
> . . . .
> (c) "Mental abuse" means a willful verbal or nonverbal action that threatens, humiliates, harasses, coerces, intimidates, *isolates, unreasonably confines*, or punishes a vulnerable adult. Mental abuse may include ridiculing, yelling, or swearing.
> (d) "Personal exploitation" means an act of forcing, compelling, or *exerting undue influence over a vulnerable adult causing the vulnerable adult to act in a way that is inconsistent with relevant past behavior*, or causing the vulnerable adult to perform services for the benefit of another.
> . . . .
> (7) "Financial exploitation" means the illegal or *improper use, control over, or withholding of the property, income, resources*, or trust

23

funds of the vulnerable adult by any person or entity for any person's or entity's profit or advantage other than for the vulnerable adult's profit or advantage. "Financial exploitation" includes, but is not limited to:

 (a) The use of deception, intimidation, or *undue influence by a person or entity in a position of trust and confidence with a vulnerable adult to obtain or use the property, income, resources,* or trust funds of the vulnerable adult for the benefit of a person or entity other than the vulnerable adult;

 . . . .

 (c) *Obtaining or using a vulnerable adult's property*, *income, resources*, or trust funds without lawful authority, by a person or entity who knows or clearly should know that the vulnerable adult lacks the capacity to consent to the release or use of his or her property, income, resources, or trust funds.

 . . . .

 (13)(a) "*Isolate*" or "isolation" *means to restrict a vulnerable adult's ability to communicate, visit, interact, or otherwise associate with persons of his or her choosing.* Isolation may be evidenced by acts including but not limited to:

 (i) Acts that prevent a vulnerable adult from sending, making, or receiving his or her personal mail, electronic communications, or telephone calls; or

 (ii) Acts that prevent or obstruct the vulnerable adult from meeting with others, such as telling a prospective visitor or caller that a vulnerable adult is not present, or does not wish contact, where the statement is contrary to the express wishes of the vulnerable adult.

RCW 74.34.115 (emphasis added).

Unfortunately, the law demands that the trial court sign a standard form order prepared by the administrative office of the courts, which form leaves little, if any, room for the trial court to enter detailed findings of fact that support entry of a protection order. RCW 74.34.115. But we can determine the court's specific findings by reviewing the oral ruling.

24

At the conclusion of the February 27, 2020 hearing, the court, in oral comments, found that Mary Ezenwa began manipulating Alan Carlin on the first day of their e-mail conversation. Ezenwa claimed she loved Alan, even though she had never met him. Although Ezenwa claimed, during the vulnerable adult proceeding, that she was asexual, Ezenwa stated they could raise a family. Alan was 82 years old, and Ezenwa was 35 years of age. Ezenwa wrote of a lifetime of love, when Alan only had a few years of life remaining.

The trial court continued during her oral findings. When guardianship proceedings began in Virginia, Mary Ezenwa flew Alan Carlin from his home of fifty years to Spokane, even though he earlier stated his physician told him not to fly. She isolated Alan from Virginia authorities and from Alan's children. Alan would not communicate with his children, and the children only serendipitously discovered his location 2,500 miles away by cellphone pings. Law enforcement officers found Alan in Cheney, where he suffered from dehydration and lived amongst piles of trash. In the meantime, Alan gave Ezenwa access to his bank records. At the conclusion of her remarks, the court commissioner specifically found isolation, emotional exploitation, and financial exploitation. The evidence before the court commissioner overwhelmingly supported her findings.

The evidence presented by Peter Carlin illustrates the need for the Vulnerable Adult Protection Act, and entry of the restraining order against Mary Ezenwa fulfilled the

policy behind the act. Decades ago in an era without cellphones, Alan Carlin's children

may have never located him, and Alan could have been subjected to months of financial

and emotional exploitation from Ezenwa.

Attorney Fees and Costs

Both parties request an award of reasonable attorney fees and costs on appeal.

Mary Ezenwa requests fees and costs under RCW 74.34.130(7). She also seeks an award

of fees in the sum of $20,000 under RCW 4.84.080(2).

RCW 74.34.130(7) declares:

> The court may order relief as it deems necessary for the protection of
> the vulnerable adult, including, but not limited to the following:
> . . . .
> (7) Requiring the respondent to pay a filing fee and court costs,
> including service fees, and to reimburse the petitioner for costs incurred in
> bringing the action, including a reasonable attorney's fee.

Contrary to Mary Ezenwa's suggestion the statute does not authorize the court to award

reasonable attorney fees to the respondent.

RCW 4.84.080(2) outlines the schedule of attorney's fees stating:

> When allowed to either party, costs to be called the attorney fee,
> shall be as follows:
> . . . .
> (2) In all actions where judgment is rendered in the [S]upreme
> [C]ourt or the court of appeals, after argument, two hundred dollars.

We assume that Mary Ezenwa misreads RCW 4.84.080 as $20,000 rather than $200. In

any event, Ezenwa does not prevail on appeal and so is not entitled to fees under the

26

statute.

Peter Carlin requests an award of attorney fees under RAP 18.9(a) which permits this court, on the motion of a party, to require payment of compensatory damages to another party for filing of a frivolous appeal. These compensatory damages typically entail payment of attorney fees. *Boyles v. Department of Retirement* Systems, 105 Wn.2d 499, 506, 716 P.2d 869 (1986). "An appeal is frivolous if there are no debatable issues upon which reasonable minds might differ and it is so totally devoid of merit that there was no reasonable possibility of reversal." *Eugster v. City of Spokane*, 139 Wn. App. 21, 34, 156 P.3d 912 (2007). "An appeal is not frivolous, however, if the appellant can cite a case supporting its position." *Schreiner v. City of Spokane*, 74 Wn. App. 617, 625 (1994). Attorneys and pro se litigants are held to the same standard. *In re Marriage of Olson*, 69 Wn. App. 621, 626, 850 P.2d 527 (1993).

We question whether Peter Carlin must establish a frivolous appeal in order to gain an award of reasonable attorney fees and costs. RCW 74.34.130(7) authorizes the court, at its discretion, to impose reasonable attorney fees and costs on the respondent in favor of the petitioner. Nevertheless, we deem Mary Ezenwa's appeal frivolous and award Peter reasonable attorney fees and costs.

Mary Ezenwa premised her appeal largely on her contention that declarations within the record are false. Nevertheless, this court does not reweigh the evidence. The evidence overwhelmingly supported the trial court's findings and ruling. Ezenwa failed

No. 37496-3-III
*Carlin v. Ezenwa*

to cite legal authorities to support her appeal.

CONCLUSIONS

We affirm the order of protection entered against Mary Ezenwa.  We award Peter

Carlin reasonable attorney fees and costs incurred on appeal.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, A.C.J.

_____
Staab, J.

28